**RADIO CORPORATION OF AMERICA**

v.

**ASSOCIATION OF SCIENTISTS AND PROFESSIONAL ENGINEERING PER-SONNEL; Association of Scientists and Professional Engineering Personnel Camden Area Chapter; Henry J. Andreas and John P. Moran, Appellants.**

**ASSOCIATION OF SCIENTISTS AND PROFESSIONAL ENGINEERING PERSONNEL, Appellant,**

v.

**RADIO CORPORATION OF AMERICA.**

**ASSOCIATION OF SCIENTISTS AND PROFESSIONAL ENGINEERING PERSONNEL, Appellant,**

v.

**RADIO CORPORATION OF AMERICA.**

Nos. 17269–17271.

United States Court of Appeals Third Circuit.

Argued March 24, 1969.

Decided Aug. 7, 1969.
Rehearing Denied Sept. 9, 1969.

Arthur S. Keyser, Kleinbard, Bell & Brecker, Philadelphia, Pa., for appellants.

Irvin R. Segal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., (Richman, Berry & Ferren, Camden, N. J., Bernard G. Segal, Philadelphia, Pa., Grover C. Richman, Camden, N. J., Samuel D. Slade, Philadelphia, Pa., on the brief), for appellee.

Before SEITZ, ALDISERT and STAHL, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

These are three appeals which were consolidated for trial in the district court and for argument before this court because they involved the same dispositive question: whether a labor dispute between Radio Corporation of America (RCA) and Association of Scientists and Professional Engineering Personnel (the Union) with respect to layoff procedure is the subject of the grievance and arbitration machinery provided for by the collective bargaining agreement.

The pertinent facts are as follows: The Union represents a collective bargaining unit made up of engineering personnel employed by RCA at its Camden, Cherry Hill and Moorestown, New Jersey plants. Both parties entered into a written Collective Bargaining Agreement (the Contract), effective July 2, 1964, to expire July 1, 1967. It covered the terms and conditions of employment for the employees within the bargaining unit, including provisions with respect to layoff procedure (Articles 9, 10, and 11).

In the spring of 1967, both RCA and the Union formally indicated, as permitted by the Contract, a desire to terminate the existing agreement and negotiate changes. Accordingly, between May 10, 1967, and the morning of July 5, 1967, twelve bargaining sessions were held. On July 5, 1967, the parties entered into a Settlement Agreement pursuant to which the Contract was to be continued in full force and effect for a period of three years, except as amended by the Settlement Agreement. The latter did not include any amendments relating to layoff procedure. However, on the same date as the execution of the Settlement Agreement, the Union and RCA signed several letter agreements, one of which encompassed the layoff procedure dispute (the Letter Agreement). In pertinent part, it states:

"This is to confirm our understanding reached in negotiations concluded today concerning the establishment of a joint committee to study and make recommendations for mutually satisfactory modifications of all aspects of the layoff procedure (such as retention, severance, rehiring) in the collective bargaining agreement.

"It is agreed that a committee shall be appointed * * * to continue to study said layoff procedure * * * In the event a satisfactory resolution of said layoff procedure is not achieved by midnight, November 1, 1967, the Association shall have the right to commence a strike at any time between midnight, November 1, 1967, and midnight, November 13, 1967. If no strike is commenced by midnight, November 13, 1967, the provisions of Paragraph 4.03 shall apply."

Pursuant to the above Letter Agreement, a study committee was formed, held a series of meetings, but was unable to reach a mutually agreeable solution to the layoff procedure problem. Full collective bargaining negotiations were then resumed on October 4, 1967, but they also proved fruitless. No agreement having been reached, the Union on November 6 exercised its right to strike under the Letter Agreement. Negotiations continued up to and throughout the strike until December 1, 1967, when RCA notified the Union that because an impasse had been reached, it was terminating negotiations and putting into effect immediately unilateral revisions of Articles 9, 10, and 11 of the Contract embodying the last proposal it put forth during the negotiations.

The Union ended its strike effective December 4, 1967, and on December 11,

1967, filed a grievance with an appropriate representative of RCA in accordance with the grievance procedure established under the Contract. The substance of the grievance was that RCA had breached Articles 9, 10, and 11 of the Contract by putting into effect its announced changes in layoff procedure. RCA immediately advised the Union that its action in that regard was not a proper subject for grievance or arbitration and that it declined to process the alleged grievance and would not participate in any proposed arbitration of such grievance. After the Union notified RCA that it was requesting the American Arbitration Association to appoint an arbitrator, RCA filed a complaint in the district court seeking a ruling that the whole question of the layoff procedure was exclusively the subject of collective bargaining and therefore not subject to the arbitration provision of the Contract. The Union then filed two separate suits in the district court, one seeking an order compelling RCA to proceed to arbitration on the grievance and the other seeking to enjoin any proposed layoff pending final adjudication of the dispute between the Union and RCA.

The three cases were tried together, and the district court, in an unreported opinion, found for RCA in all three. These three appeals by the Union followed.

The Union's principal contention on appeal is that the district court did not limit itself to deciding the issue of arbitrability, but "actually succumbed to the temptation of trying to decide [the merits of] the dispute raised by the grievance." It does not quarrel with the conclusion of the district court that the Letter Agreement must be considered along with the Settlement Agreement in resolving the issue of arbitrability,[1] but argues that "its construction, as is true of the construction of other provisions of the Contract (except for the Griev-

ance and Arbitration clause) must be left to the arbitrator."

The court's role in this dispute is limited solely to determining the issue of arbitrability and has been stated to be the following:

"Arbitration is a matter of contract and a party can not be required to submit to arbitration any dispute which he has not agreed so to submit. Whether or not a party to a contract is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court, not by the arbitrator, on the basis of the contract entered into by the parties. United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409; Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462; John Wiley & Sons, Inc. v. Livingston, etc., 376 U.S. 543, 546–547, 84 S.Ct. 909, 11 L.Ed.2d 898." Retail Clerks International Ass'n, Etc. v. Lion Dry Goods, 341 F.2d 715, 719–720 (6th Cir. 1965).

We are hence called upon to determine whether the parties agreed to submit the dispute over layoff procedure to arbitration, keeping in mind that:

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353 (1960).

To make this determination we must first isolate the nature of the dispute. The asserted grievance is that RCA violated the terms of the Labor Agreement, dated July 5, 1967, by announcing its intention to implement its last proposal with respect to layoff procedure made

1. Since the Settlement Agreement and the Letter Agreement were executed contemporaneously by the two parties, they must be considered together in determining what contractual obligations the parties arrived at on July 5, 1967, with respect to layoff procedure.

during the negotiations. RCA does not deny it had such an intention, but maintains that it was entitled to do so because it had not agreed by the arrangement of July 5 to include any layoff procedure provisions in the new collective bargaining agreement. The dispute therefore raises only the issue of whether or not the new collective bargaining agreement contains terms covering layoff procedure. It thus can be seen from the nature of the dispute that a resolution of the issue of arbitrability will automatically constitute a determination of the asserted grievance.

■ The Union contends that the issue we have isolated is properly one for the arbitrator and not for the court to determine because the controversy goes to the heart of the asserted grievance. We cannot agree. While the controversy does go to the heart of the asserted grievance, it does not follow that the court is thereby precluded from discharging its obligation to determine whether the parties agreed to submit the particular dispute to arbitration. The Union cannot by couching its grievance in language of a contract construction problem prevent the court from carrying out its duty. We look then to the pertinent language of the arbitration provision (para. 8.04) of the new collective bargaining agreement:

"The authority of the Arbitrator shall be limited to determining questions involving the interpretation or application of the terms of this Agreement. He shall have no authority to add to,

subtract from, or to change any of the terms of this Agreement or any Area Agreement * * *"

By this language the parties agreed that the arbitrator would only have jurisdiction over disputes concerning the interpretation and application of contract provisions. In contrast, resolution of the dispute here involves a determination of the presence or absence of terms of the contract, i.e., what the parties agreed to. Admittedly, such a determination is solely one for the court. We therefore proceed with our resolution of the merits of the question raised by the asserted grievance which turns on what the parties agreed to by the arrangement of July 5, 1967.

■ To understand what happened on July 5, 1967, some background is necessary. When the negotiations for a new contract began on May 10, both parties were dissatisfied with the layoff procedure in the then existing collective bargaining agreement. As the deadline for the termination of the old collective bargaining agreement approached, the dispute, which had covered a wide range of issues, finally narrowed itself to one area: layoff procedure. In the early morning hours of July 5 after all-night negotiations the parties resolved the deadlock in the following manner: they incorporated the terms to which they agreed in the Settlement Agreement and several letter agreements; with respect to the admittedly unsettled dispute over layoff procedure the parties signed the Letter Agreement in question here.[2]

2. The following explanation of the Letter Agreement and the events surrounding its signing was printed in the July issue of "Exponent," the official Union publication:

"Since the parties were unable to reach a settlement on ASPEP's [the Union] demand that the Layoff Provisions of the Agreement be revised it was agreed that a joint study committee would be appointed and efforts would be made to find a mutually acceptable layoff plan before November 1, 1967. If no agreement is reached by that date, ASPEP Members will have the right to invoke economic

sanctions in support of their demand for a fair and equitable Layoff Procedure. The joint study committee will operate under the continuing auspices of Commissioner John R. Murray of the Federal Mediation & Conciliation Service.

"Negotiations for the new Agreement were started in May and continued intermittently until June 29th, when the services of Commissioner Murray were offered and accepted in efforts to make some progress in the apparently deadlocked talks.

"The final negotiating session began at 10 a. m. on Tuesday, July 4th and

The Letter Agreement set up procedures to continue collective bargaining negotiations on the issue and provided that if no solution was reached by November 1, the Union would have the right to strike. It is clear then that in view of the total contractual arrangement the parties did not agree to terms covering layoff procedure as part of the new collective bargaining agreement, but rather left the dispute to be resolved by further collective bargaining as outlined in the Letter Agreement. It follows that the Union could not properly invoke the jurisdiction of the arbitrator based on the alleged existence of a layoff procedure in the new collective bargaining agreement.[3]

■ The Union seems to suggest that the view we have adopted with respect to the July 5 arrangement results in a situation where there is no provision governing layoff procedure after July 5 and that this reflects the unreasonableness of our view. Even assuming that our conclusion as to the July 5 arrangement had the effect claimed by the Union, it would not necessarily alter our

decision. But we need not pursue this further because of the following provision of the old collective bargaining agreement:

> Para. 20.01: "During the negotiation of any proposed changes, this Master Agreement and all Area Agreements shall continue in full force and effect, except that para. 4.03 [the no strike-no lockout provision] shall not extend beyond the termination date above stated [July 1, 1967] unless such extension is mutually agreed to in writing."

Hence while the parties were negotiating over the disputed issue, the layoff provisions of the old terminated agreement would continue in force and would govern any layoffs occurring during this period. Similarly, any grievances arising under those provisions during that period would be subject to the grievance-arbitration machinery of the old contract.

■ However, our concern here is not with the period of continued negotiations contemplated by para. 20.01 of the

continued without letup until 6:30 a.m. on Wednesday, July 5th when tentative agreements were reached on all pending issues.

\*     \*     \*     \*     \*

"During the final stages of negotiations, it was apparent that the Company's negotiators were hopeful that the economic "package" which they were offering would be so attractive that the ASPEP Membership would also accept the loss of representation rights at the Cherry Hill Plant and a layoff plan which would permit indiscriminate layoffs without regard to an engineer's relative retention credit standing.

"ASPEP's spokesmen quickly removed all doubts from the minds of the Company's negotiators regarding the Members' determination that no agreement was possible under such conditions. It was at this point that the balance of the Company's demands were removed from the bargaining table and the four-month period was set to resolve the last remaining issue of the Layoff procedure."

3. The Union called to our attention at oral argument a per curiam decision of this court in United Engineering & Foundry Employees Assn. Independent Union v. United Engineering & Foundry Co., 389 F.2d 479 (1967). Passing over the questionable application in that case of the Supreme Court's mandate that it is for the court to decide whether or not a party has agreed to arbitrate a particular issue, we think the case is distinguishable. That case recognized in quoting from United Steelworkers of America v. Warrior & Gulf, supra, 363 U.S., at 584-585, 80 S.Ct., at 1354 that "In the absence of any express provision excluding a particular grievance from arbitration, \* \* \* only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail \* \* \*." As we have shown in our opinion, the Letter Agreement represents conclusive, forceful evidence of the parties' intention to exclude layoff procedure from the coverage of the new collective bargaining agreement.

**898**

old collective bargaining agreement. This period ended when the negotiations reached an impasse, and it is not challenged that this occurred at the latest on December 1, 1967, when RCA announced that, since an impasse had been reached, it was ending the discussions and putting into effect its last proposal with respect to layoff procedure. Indeed, the Union apparently thought that an impasse had been reached earlier when it exercised its right to strike on November 6.[4] Since the action by RCA giving rise to the asserted grievance occurred after the impasse had been reached, para. 20.01 was no longer operative with respect to the dispute. See Paterson Parchment Paper Co. v. International Brotherhood of Paper Makers, 191 F.2d 252, 254 (3rd Cir. 1951), cert. den. 342 U.S. 933, 72 S.Ct. 376, 96 L.Ed. 694 (1952).

The Union also contends that this court has previously construed the language of this very labor agreement to be broad enough to encompass a grievance such as the one before us now, citing Radio Corp. of America v. Association of Professional Engineering Personnel, 291 F.2d 105 (3rd Cir. 1961), cert. den., 368 U.S. 898, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961). It is true that the case involved a collective bargaining agreement between the same parties and including the same arbitration provision. However, the court decided that the dispute involved an interpretation of the contract as that phrase is used in the agreement defining the types of disputes which should be arbitrable. In contrast, our concern here is whether particular subject matter was or was not covered by a term of the collective bargaining agreement. Such a question, as we have already concluded, is properly one for the court to decide.

The judgments of the district court will be affirmed.

4. In fact, the strike action alone may be considered incompatible with the further existence of any right to arbitration.

See Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957).