**UNITED STEELWORKERS OF AMERICA, AFL–CIO, Plaintiff-Appellant-Cross Appellee,**

v.

**UNITED STATES GYPSUM COMPANY, Defendant-Appellee-Cross Appellant.**

No. 72–2694.

United States Court of Appeals, Fifth Circuit.

April 11, 1974.

Rehearing Denied July 31, 1974.

---

Jerome A. Cooper, Birmingham, Ala., Bernard Kleiman, Gen. Counsel, Chicago, Ill., Michael H. Gottesman, Jeffrey Gibbs, Washington, D. C., for plaintiff-appellant.

J. S. Gruggel, Jr., John J. Coleman, Jr., Birmingham, Ala., Harold D. Burgess, J. T. Otis, Chicago, Ill., for defendant-appellee.

Before BELL, INGRAHAM and RONEY, Circuit Judges.

INGRAHAM, Circuit Judge:

From court to arbitrator and back again, this § 301[1] case is here on an appeal by both parties from the district court's decision, 339 F.Supp. 302 (N.D. Ala., 1971), enforcing, modifying and setting aside portions of an arbitrator's award which followed our earlier decision ordering United States Gypsum Company to arbitrate the union's grievances pursuant to the collective bargaining agreement between the union and Gypsum's predecessor. United States Gypsum Company v. United Steelworkers of America, 384 F.2d 38 (5th Cir., 1967), cert. den. 389 U.S. 1042, 88 S.Ct.

1. Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185, provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

See generally Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed. 2d 972 (1957) (Substantive law to be applied in suits under § 301(a) is federal law, which courts must fashion from the policy of our national labor laws.)

783, 19 L.Ed.2d 832 (1968) (*Gypsum I*). Significant issues are raised concerning the power of an arbitrator to hold a so-called successor employer bound by substantive provisions of its predecessor's collective bargaining agreement, as well as the scope of an arbitrator's remedial authority once he has concluded that certain provisions are binding and have been violated.

### I.

The factual background of this case is summarized in our previous opinion, and with somewhat more detail in the arbitrator's [2] 116 page opinion. We will borrow liberally from these sources to set out under one roof the facts underlying this extended litigation.

The genesis is February 1958, when the union was certified after an election as the exclusive bargaining representative of the production and maintenance employees of a lime plant in Montevallo, Alabama, owned at that time by United Cement Company, Inc. Collective bargaining agreements were entered into between the union and United for the years 1958–1961, 1961–1964, and 1964–1967, the latter agreement to run from March 30, 1964 until March 30, 1967. Approximately six months after the last agreement began, discussions ensued between United and Gypsum for sale of the plant. As is, or was at least, standard practice, no union representatives participated in the negotiations leading up to the sale.[3] The union first learned of the proposed sale on March 19, 1965, when United posted a notice telling its employees that Gypsum would likely exercise an option to purchase the plant on April 1, 1965. Between March 22 and March 26, Gypsum interviewed United's employees, discussing employment prospects and the future operation of the plant. United closed the plant on March 28, terminating all employees effective that date. The transaction was completed on April 1, 1965.

Gypsum purchased all of the assets and property of United excluding cash, accounts receivable and certain contracts not here pertinent. Also excluded in the purchase agreement was the collective bargaining contract which still had two years remaining in its term. Gypsum subsequently hired all but three of United's former employees and began operating the plant on April 5. "Except that [Gypsum] did not check off union dues, determined seniority as of the date of employment with it, and by agreement installed a health insurance plan, the terms of employment were substantially the same as before the purchase. So too, was the physical operation—same work force, same plant, same process, same product (except for trade name), under the same supervisors." *Gypsum I, supra*, 384 F.2d at 41.

Although a union representative wrote a letter to Gypsum on March 29 and received a response saying the company would be glad to meet with the union, nothing significant happened until Gypsum failed to check off union dues for April. This precipitated a May 3rd letter from the union to the company inquiring into the matter; the company replied that it was not operating under the collective bargaining agreement.

The union thereafter prepared and submitted to the company the grievances which are the subject of this litigation. Steadfastly maintaining that the collective bargaining agreement was no longer in effect, Gypsum refused to arbitrate. Then, on June 11, the union began *Gyp-*

---

2. The arbitrator was Mr. Rolf Valtin, the permanent arbitrator under the nationwide collective bargaining agreement between General Motors and the United Auto Workers. The delay between the submission to the arbitrator and his decision was due in part to this responsibility; the parties were apparently well aware of the possibility of delay when they selected Mr. Valtin.

3. Interestingly, the Supreme Court's decision in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), came down on March 30, 1964, six months before these discussions began and on the day the last agreement between the union and United started to run.

*sum I* by filing suit in federal court under § 301 asking that Gypsum be compelled to arbitrate the union's grievances pursuant to the collective bargaining agreement. While this suit was pending, Gypsum began its counterattack before the National Labor Relations Board by filing a representation petition seeking to have the union decertified.[4] Responding to this move, the union filed a charge with the board alleging that Gypsum had violated § 8(a)(5) of the Act, 29 U.S.C. § 158,[5] by refusing to bargain with the union. Shortly thereafter, this charge was withdrawn.[6]

Gypsum lost before the board on the initial petition, 157 NLRB No. 60, but

refiled several weeks later under the board's new standard.[7] While this second petition was pending before the board, the district court ordered Gypsum to arbitration on the basis of the Supreme Court's decision in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). This was in May 1966 with ten months still remaining to the collective bargaining agreement. Gypsum appealed from this decision, but before the case was decided on appeal, the board ordered an election, 161 NLRB No. 61, pursuant to Gypsum's petition. The union lost the election and was formally decertified on December 2, 1966.

4. Section 9(c)(1)(B) of the Act, 29 U.S.C. § 159, provides the mechanism by which an employer may seek a board conducted election among its employees for the purpose of ascertaining whether the union still maintains its majority status.

5. This section provides that, subject to the provisions of § 9(a), 29 U.S.C. § 159, an employer commits an unfair labor practice by refusing to bargain collectively with a union.

6. The following excerpt from the arbitrator's opinion sheds some light on this event:

"At the arbitration hearing, Union lawyer Cooper explained why this 8(a)(5) charge was dropped. In reading his explanation, to be set forth momentarily, certain points should be held in mind. First, it is the policy of the Board that the presence of an unfair labor practice charge blocks an "RM" or other form of representation proceeding. The Board, in other words, will not direct an election while an unfair labor practice charge is pending. The reason behind the policy is that if an election were conducted during the pendency an unfair-labor-practice charge, and the charge were subsequently found to have merit, the election (if the result is in favor of the party having committed the unfair labor practice) would be tainted and invalid because it was preceded by unlawful conduct hindering a free choice. The blocking policy, in short, is intended to avoid the conducting of useless elections. Second, the processing of an unfair-labor-practice charge is more time-consuming than the processing of a representation petition. Third, what the Union would have obtained, had it successfully pursued the unfair-labor-practice route, would have been a Board order on the Company to bargain with the Union. The Union preferred an order requiring the honoring of the existing

Agreement (the result which would have been obtained had the existence of the Agreement been held to bar an election).

"Mr. Cooper put it as follows:

"Of course, we wished and preferred to have our contract in effect rather than to get an order to bargain from the Board because in our contract, as I commented a moment ago, we had a checkoff provision. And if we could have succeeded in having our contract and our arrangements enforced by the Court's order, it was preferable to us rather than to have the Board's order with the possibility of a labor dispute and subsequent strikes, trying to get U.S. Gypsum to agree to what we thought we already had in our contract. 'And so, we withdrew our 8(a)(5), our refusal to bargain, charge so that the Board could go ahead and decide the representation proceeding.' "

7. When the first representation petition was filed, the board required only that a union claim representative status and that the employer question such status. The board did not question an employer's good faith in refusing to continue recognition and "where there has been a mere change in the ownership of an employing enterprise and no express assumption of the pre-existing contract, the Board has consistently directed an election upon an employer's petition." But the board acted on Gypsum's first petition under a new "good-faith doubt" rule and concluded: "No objective evidence appears on the record that could furnish a reasonable basis for [Gypsum] to believe that the Union might have lost its majority status. Indeed, [Gypsum] . . . presented facts which, if anything, would tend to negate the contention that any such reasonable doubt could exist." 157 NLRB No. 60.

On appeal we affirmed the district court, holding "that the predecessor contract bound the Successor to arbitrate claims under it." *Gypsum I*, supra, 384 F.2d at 44. And in response to Gypsum's assertion that as a result of the decertification the union could no longer represent the employees, even before an arbitrator, the court reasoned that "compelling this limited post-decertification recognition by the employer of the repudiated representative is consistent with the policies sought to be achieved by the Act." *Id.* at 47. The court then considered and rejected Gypsum's arguments that the grievances were not arbitrable, essentially concluding that they did not go to the initial question of arbitrability, but were rather defenses to be raised before the arbitrator or to be considered by a court in its review of any enforcement proceedings. *See* United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Textile Union Workers of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Chief Judge Brown then sounded the familiar caveat that merely holding the grievances arbitrable was not "even a remote suggestion of how the merits are to, or must, be determined" and did not "begin to put an advance court imprimatur on the award." 384 F.2d at 49. Thus three years after the grievance report had been filed, two years after the district court had ordered arbitration, a year and one-half after the union's decertification, and a year after the collective bargaining agreement had expired,

the following grievances went to the arbitrator in May 1968:

"1. The Company refuses to recognize and comply with the contract executed on March 30, 1964. (sic)

"2. The Company has filed vacancies such as burner helper without complying with Article VIII of the contract.

"3. The Company has failed and refused to deduct union dues in accordance with Article VI of the contract.

"4. The Company has refused to recognize seniority as established in Article VIII of the contract.

"5. The Company has announced that it is not bound by said contract.

"6. The Company has refused to recognize or deal with the duly authorized officers and representatives of the Union."

In February 1971 the arbitrator rendered his decision. Regarding grievances 1, 5 and 6 he held the collective bargaining agreement binding on Gypsum to the extent that the union was entitled to recognition as bargaining representative for the period between the take-over and the union's decertification, April 1, 1965 until December 2, 1966. Gypsum was therefore held to have violated the agreement by refusing to negotiate with the union pursuant to the wage reopener provision of the contract;[8] the arbitrator reasoned that this dispute was inherent in grievances 1, 5 and 6. As a remedy for this violation he concluded that since negotiation this long after decertification (5 years) was impractical, Gypsum should be held liable for the wage increase it would have agreed to had negotiations occurred. He determined this amount to be 10¢ an hour. Gypsum was ordered to

---

8. Article XVI of the contract provides as follows:

"In connection with the third year of this contract, it has been agreed that the contract may be reopened only for the negotiation of a wage increase and paid holidays as a fringe issue. Any notices to re-open contract for either or both of these two issues during the third year are to be given in the same manner as that required by law to negotiate for a new contract."

pay an amount calculated on a 10¢ per hour increment for the work period from April 1, 1966, the reopener date, until October 10, 1966, the date on which the company unilaterally granted a 6¢ per hour increase, and calculated on a 4¢ per hour increase from October 10, 1966 until the date of payment. Concerning holidays, which were also subject to negotiation under the reopener, the arbitrator decided that no changes would have been made and therefore awarded no relief in this regard.

Seniority issues were raised by grievances 2 and 4. After examining the practices prevalent prior to Gypsum's take-over, the arbitrator concluded both that they were not actively followed previously and that the proof was insufficient to establish a violation anyway.[9] He therefore held for the company on these two grievances.

The remaining grievance concerned Gypsum's failure to check off union dues.[10] Holding this provision of the agreement also binding on Gypsum, the arbitrator ordered the company to pay the union the amount which should have been paid from April 1965 until December 1966. Payment was to be made by the company without deductions from the wages of any employees. Finally, the arbitrator ordered Gypsum to pay 6% interest, compounded quarterly, on both the wage and check off awards from April 1, 1965 until the date of payment.

The union then returned to the district court seeking an order enforcing the award. On the basis of John Wiley & Sons, Inc. v. Livingston, *supra*, the Court agreed with the arbitrator that substantive contractual provisions of a predecessor's collective bargaining agreement could govern a successor

---

9. The union also sought to arbitrate a dispute relating to improper discharges, but this attempt was rejected with the following statement:

> "As to the discharges, the chief difficulty is that the Grievance Report is void of any reference to discharges. Nor—unlike the matter of the wage reopener, as will be further explained below—does the Arbitrator believe that the discharges can be seen as impliedly having been covered by Items 1, 5 and 6. The discharge of an employee is by no means necessarily an improper event, and it is not unusual for a discharge to be left standing without the filing of a grievance protesting it . . . And even if one were to excuse the absence of grievances . . . the difficulty would be that the record is bare of any evidence concerning the discharges and that it would be next to impossible now to reconstruct the circumstances surrounding the discharges and to adduce reliable evidence."

The arbitrator continued with a discussion of the seniority problem:

> "The seniority assertions have the same lack-of-evidence difficulty. One searches the record in vain for details concerning the Burner Helper claim. But there is here a further element. The record indeed seems to confirm, quite as the Company charges, that it had long been true (i. e., while United Cement was operating the plant) that vacancies in jobs such as the Burner Helper job were not posted; that the Union, if not

affirmatively support (sic), acquiesced in this; and that racist reasons lay behind it —to keep blacks from filling promotional vacancies. Insofar as the senitority issue is concerned, the Union comes with unclean hands. It is difficult to restrain the reaction 'a plague on both your houses.'

> "One need not go so far as to uphold the Company's contention that Article VIII had been removed from the Agreement. But it was dormant, and it required re-activation as a condition of enforcement. The raising of the seniority claims as part of this Grievance Report, the essential purpose of which is a very broad one, represents something other than such re-activation."

10. The pertinent portion of Article VI reads as follows:

> "The Company agrees to deduct Union dues in the sum of $5.00 per month from the pay of employee who gives written authorization to the Company for such deduction, and to transmit dues collected to the International Secretary-Treasurer, Pittsburgh, Pennsylvania, on or before the fifteenth of the month in which such dues are collected as long as such authorization is validly in effect and is not revoked by the employee. Deductions will be made on the first pay period in each month. All revocations must be in writing addressed to the Company with a copy forwarded to the recording secretary of the local union."

employer.[11] Thus the court upheld the finding that Gypsum was required to negotiate with the union pursuant to the wage reopener. But although in accord with the arbitrator that it was too late to negotiate, the court concluded that the arbitrator's alternative remedy could not not be enforced. This decision appears based on two propositions: (1) that a reopener provision confers only a right to negotiate and that the arbitration clause of the contract would not permit the arbitrator to, in effect, make an agreement for the parties; and (2) that this remedy violated the principle of free collective bargaining as explained in H. K. Porter Co. v. NLRB, 379 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).

The court upheld the arbitrator's determination that the check off provision was binding on Gypsum and that the union was entitled to the amount of dues which should have been paid from April 1965 until December 1966. However, the court refused to enforce the arbitrator's direction that the company pay the award without corresponding deductions from employees' wages, reasoning that to sustain this ruling would require the company to violate § 302(a) of the Act, 29 U.S.C. § 186(a).[12] The court accordingly modified the award to the extent that employees still with the company must pay the dues from future wages while amounts due from those no longer employed were to be paid by the company. The court also modified the manner in which the arbitrator ordered interest paid although it did conclude that this aspect of the award was within the arbitrator's remedial authority.

The court then added a twist of its own. The union was given the option of withdrawing its insistence on lost dues and taking instead "an amount to fairly compensate it for its attorney's fees and costs over this almost six year struggle." 339 F.Supp. at 309. This approach was accepted by the union, and the court's final judgment awarded attorney's fees of $8,850 and taxed costs to the company.

Both the union and Gypsum have appealed from this decision. We affirm those aspects of the decision enforcing

11. The court read our prior opinion as concluding "that the defendant was bound by the terms of [United] Cement's agreement and that only an overturning of *Wiley* could produce a different result." 339 F.Supp. at 306. We do not read our decision as going this far; all we held was that Gypsum was bound to arbitrate, leaving it to the arbitrator to determine the particular provisions, if any, which were binding on Gypsum. Nonetheless, the district court was definitely aware of the crux of the problem as the following statement illustrates: "It is difficult to perceive how a successor employer could be required to arbitrate claims arising on account of conduct after its takeover in alleged violation of the agreement without, of necessity, holding that it was bound by the terms of such agreement." *Id.* But it is not analytically necessary to hold the provisions binding as a condition precedent to arbitration, as both *Wiley* and our prior opinion illustrate. What is necessary, however, is the belief that the arbitrator has the power to find provisions binding.

12. "(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization."

the arbitrator's award, reverse the court's refusal to enforce the remedy on the wage reopener award, and remand for additional proceedings consistent with this opinion.

## II.

█ The first issue is whether under the circumstances of this case the arbitrator could, consistent with current national labor policy, hold Gypsum bound by the dues check off and wage reopener provisions of its predecessor's collective bargaining agreement when Gypsum neither agreed to nor assumed the contract.[13] The question arises in this manner as a result of the Supreme Court's decision in NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The Court there held that, although Burns, as a successor employer, was obligated to bargain with the union, the NLRB could not require it "to observe the substantive terms of the collective bargaining agreement the union had negotiated with [Burns' predecessor] and to which Burns had in no way agreed."[14] Id. at 281–282. Gypsum argues that the policies underlying this decision preclude an arbitrator from doing what the board cannot do.

Resolution of this question must begin with the Court's decision in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Interscience Publishers, Inc. had negotiated a collective bargaining agreement with a union representing forty of its eighty employees and this agreement contained an arbitration clause. Interscience thereafter merged with Wiley, none of whose three hundred employees were organized. After Wiley and the union could not agree concerning the effect of the merger on the contract rights of the employees hired by Wiley and

covered by the agreement, the union brought a § 301 suit to compel arbitration. The Supreme Court held "that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." Id. at 548. The foundation for this decision is "the central role of arbitration in effectuating national labor policy," id. at 549, coupled with the conclusion that a collective bargaining agreement, representing the common law of the shop, is "not in any real sense the simple product of a consensual relationship." Id. at 550. Wiley's obligation to arbitrate was thus "construed in the context of a national labor policy." Id. at 551. Although Wiley was not a party to the agreement, it was nevertheless appropriate for it to arbitrate grievances arising under that agreement because of the substantial continuity of identity—"adequately evidenced by the wholesale transfer of interscience employees to the Wiley plant"—existing in the business enterprise before and after the change in ownership. Id. at 551.

Arbitration was seen as the key to the avoidance of industrial strife and as a vehicle for affording some protection to the legitimate interest of employees in a stable employment relationship.

"The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden

---

13. The issue could logically be posed more broadly for the initial inquiry relates to the power or authority of an arbitrator to act (that is, to hold substantive provisions binding at all) rather than whether a particular act is an appropriate response to a given set of facts.

14. The Court did say, however, that "in a variety of circumstances involving a merger, stock acquisition, reorganization, or assets purchase, the Board might properly find as a matter of fact that the successor had assumed the obligations under the old contract." 406 U.S. at 291.

change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by 'the relative strength . . . of the contending forces.' [citing United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)]."

376 U.S. at 549. *See generally* S. Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw.U.L.Rev. 735, 737 (1969); F. Slicker, A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach, 57 Minn.L.Rev. 1051, 1052–53 (1973). Wiley was therefore ordered to submit the union's grievances to the arbitral process, the Court deciding nothing more than that the arbitration provision of the collective bargaining agreement survived the merger. *See* Note, The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley & Sons, Inc. v. Livingston, 82 Harv.L.Rev. 418, 420–22 (1968).

On the basis of *Wiley* we ordered the case at bar to arbitration.[15] The requisite substantial continuity of identity was easily found from the combined facts that Gypsum purchased substantially all of United's assets, hired all but three of United's employees including supervisors, and continued the physical operation of the lime plant intact. As had other courts, we declined to distinguish *Wiley* on the ground that it involved a merger. *E. g.*, United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3rd Cir., 1964); Wackenhut Corp. v. International Union, United Plant Guards, 332 F.2d 954 (9th Cir., 1964). And true to the holding of *Wiley*, we left to the arbitrator, subject to judicial review, the decision of which substantive contractual provisions, if any, should bind the successor. Implicit in this whole process of sending the successor and the union to arbitrate grievances arising under the collective bargaining agreement between the union and the predecessor is the assumption that the arbitrator had the power to find substantive provisions of the agreement binding on the successor.[16]

15. Gypsum's primary defense in *Gypsum I* was "a frontal, massive assault on *Wiley*." 384 F.2d at 42. We described that assault as follows:

 " 'The Successor's complaint is the bald one that *Wiley* and those cases specifically applying it to asset acquisitions' are simply wrong.

 "We may grant that the assault is well constructed and formidable, resting primarily on the assertion that from deficiencies in advocacy, the Court was either led or pushed into error. The main thread has two strands. The first is that *Wiley* failed to reckon with the deeply ingrained, deliberate Congressional policy against compulsory arbitration which is brought forward as a part of the LMRA. The second is that through ineptness of the adversaries or self interest of the successor the Court had pressed on it the 'continuity of identity' test presumably in the hopes that factually the Court would find it not to have been satisfied. Out of self interest of a litigant this was to introduce a beguiling, though erroneous, concept. This, the argument runs, is so because it fails to reckon with the distinction between a successor employer's (a) duty to recognize and bargain with the collective bargaining representative of the predecessor employer, and (b) the scope of such successor's obligation actually to reach a contract. Apparently this leads the Successor to conclude that while it had (until decertification) the (a) duty to recognize and bargain in good faith, it had no duty to (b) conclude an agreement and since it could not be compelled to reach an agreement, it could not be forced to accept an agreement made by others."

16. Otherwise, the arbitrator would not have a contract to interpret and apply in order to resolve the dispute. *Gypsum I* did not, however, suggest guidelines to aid the arbitrator in deciding which substantive provisions should survive. *Compare* United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3rd Cir., 1964), *with* Wackenhut Corp. v. International Union, United Plant Guards, 332 F.2d 954 (9th Cir., 1964). *See also* Note, The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley & Sons, Inc. v. Livingston, 82 Harv.L.Rev. 418, 426 (1968), in which the author, although agreeing that the arbitrator should decide the issue, observes that "giving the arbitrator authority to determine which substantive pro-

NLRB v. Burns International Security Services, *supra*, requires that we reexamine the validity of this assumption.[17] Burns won a competitive bid to furnish protection for a plant where Wackenhut Corporation had previously provided this service. Of the forty-two guards employed at the plant by Burns, twenty-seven were formerly employed by Wackenhut and were represented by a union, certified just four months earlier after a board-conducted election, under a collective bargaining agreement negotiated by the union with Wackenhut. When Burns refused to bargain with the union, unfair labor practice charges were brought to the board. In addition to holding that Burns, as a successor employer, was required to recognize and bargain with the union, the board ordered Burns to honor the substantive terms of the collective bargaining agreement negotiated by the union with Burns' predecessor. On appeal the Second Circuit enforced the board's order that Burns bargain with the union. But the court refused to enforce the order requiring Burns to abide by the collective bargaining agreement; the court considered this order as exceeding the board's authority. 441 F.2d 911 (2 Cir. 1971).

The Supreme Court split five-four concerning the propriety of the order that Burns bargain with the union. Mr. Justice White, writing for the majority, said that "Burns' obligation to bargain with the union over terms and conditions of employment stemmed from its hiring of Wackenhut's employees and from the recent election and Board certification." 406 U.S. at 278–279. "[W]here the bargaining unit remains unchanged and a majority of the em-

ployees hired by the new employer are represented by a recently certified bargaining agent, there is little basis for faulting the Board's implementation of the express mandates of § 8(a)(5) and § 9(a) by ordering the employer to bargain with the incumbent union." *Id.* at 281. The dissent, relying primarily on the absence of any relationship between the succeeding employers, argued forcefully that Burns had no statutory obligation to bargain with the union because Burns was not a successor to Wackenhut. *Id.* at 307.

The Court was unanimous, however, in affirming the Second Circuit's refusal to enforce the board's order that Burns honor the substantive terms of the collective bargaining agreement. Rejecting the board's position that avoidance of industrial strife and protection of employees from sudden changes in the employment relationship justified holding Burns bound by the contract, the Court found the policy in favor of free collective bargaining of overriding significance.

> "It does not follow . . . from Burns' duty to bargain that it was bound to observe the substantive terms of the collective-bargaining agreement the union had negotiated with Wackhenhut and to which Burns had in no way agreed. . . . 'The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel.' NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893 (1937)."

visions of the contract will carry over takes him outside his accustomed role of interstitial interpretation and application of the common law of the shop."

17. *See* P. Nash, Successorship In Light of Burns, 7 Ga.L.Rev. 664 (1973); W. Pate, The Impact of Burns, 7 Ga.L.Rev. 687 (1973); T. St. Antoine, Judicial Caution and the Supreme Court's Labor Decisions, October Term 1971, 6 Mich.J.L.Ref. 269 (1973); F.

Slicker, A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach, 57 Minn.L.Rev. 1051 (1973); R. Wachs, Successorship: The Consequences of Burns, 24 Lab.L.J. 221 (1973); Note, Contract Rights and the Successor Employer: The Impact of Burns Security, 71 Mich.L.Rev. 571 (1973); The Supreme Court, 1971 Term, 86 Harv.L.Rev. 50, 247 (1972).

*Id.* at 281–283. The Court recognized that Burns was the first case in which the board held a successor bound by substantive contract terms and that this departure from prior board decisions was largely attributable to the Court's reasoning in *Wiley.* But this change in approach was outside the scope of the board's authority. "[T]he Board is without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement. . . . The Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself. One of these fundamental policies is freedom of contract." *Id.* at 283–284, quoting H. K. Porter Co. v. NLRB, 397 U.S. 99, 102, 108, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). The obvious question is whether these same policies likewise limit an arbitrator, acting pursuant to *Wiley's* command that a successor arbitrate a union's grievances under the predecessor's collective bargaining agreement, from imposing portions of the contract on a successor.

*Burns* distinguished *Wiley* in three ways. First, the Court emphasized the procedural differences in the cases. While *Burns* arose "in the context of an unfair labor practice proceeding where the Board is expressly limited by the provisions of § 8(d)," *Wiley* was a § 301 case, involving the duty to arbitrate, and leaving "to the arbitrator, subject to judicial review, the ultimate question of the extent to which, if any, the surviving company was bound by other provisions of a contract." 406 U.S. at 285–286. Next, characterizing *Wiley's* holding as a narrow one, the Court noted that *Wiley* involved a merger set "against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation." *Id.* at 286.[18] Finally, the fact that there was no relationship between the succeeding employers was stressed by the following statement:

"Here there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut and

18. *See generally* Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182, n. 5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), in which Mr. Justice Brennan, writing for a unanimous Court, noted that the evolution of the law of successorship had not been dependent on the manner in which that event occurred:

"We recognize that, unlike the situation in *Wiley* where state law provided some support for holding the successor by consolidation liable, see 376 U.S., at 547–548, the general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability. See 15 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7122–7123 (1961 rev. ed.) ; Kloberdanz v. Joy Mfg. Co., 288 F. Supp. 817 (D.C.1968). The perimeters of the labor-law doctrine of successorship, however, have not been so narrowly confined. See 15 W. Fletcher, *supra,* § 7122, at 196 (Supp.1972) ; Slicker, A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach, 57 Minn. L.Rev. 1051, 1062–1063 (1973). Successor-

ship has been found 'where the new employer purchases a part or all of the assets of the predecessor employer, NLRB v. Interstate 65 Corp., 453 F.2d 269 (CA6 1971) ; [and] where the entire business is purchased by the new employer, NLRB v. McFarland, 306 F.2d 219 (CA10 1962). . . .' NLRB v. Burns Int'l Security Services, Inc., 406 U.S. 272, 306 (1972) (dissenting opinion) ; see *id.,* at 291 (opinion of the Court). The refusal to adopt a mode of analysis requiring the Board to distinguish among mergers, consolidations, and purchases of assets is attributable to the fact that, so long as there is a continuity in the 'employing industry,' the public policies underlying the doctrine will be served by its broad application. Cf. NLRB v. Colten, 105 F.2d 179, 183 (C.A.6, 1939)."

*Golden State* held that a "bona fide purchaser of a business, who acquires and continues the business with knowledge that his predecessor has committed an unfair labor practice in the discharge of an employee, may be ordered by the National Labor Relations Board to reinstate the employee with back pay." *Id.* at 170. The Court found support for this result in the policies underlying *Wiley,* which were apparently not undermined by *Burns.*

Burns. On the contrary, they were competitors for the same work, each bidding for the service contract at Lockheed. Burns purchased nothing from Wackenhut and became liable for none of its financial obligations. Burns merely hired enough of Wackenhut's employees to require it to bargain with the union as commanded by § 8(a)(5) and § 9(a). But this consideration is a wholly insufficient basis for implying either in fact or in law that Burns had agreed or must be held to have agreed to honor Wackenhut's collective bargaining contract."

*Id.* at 286–287.

Reading the *Burns* opinion as a whole could justifiably leave one with the conviction that it presages a similar holding to the effect that an arbitrator, operating within the same basic framework of national labor policy as the board, does not generally [19] have the power to bind a successor to substantive provisions of a collective bargaining agreement to which it is not a party.[20] We decline, however, to adopt that position at this juncture. Clearly, the holding in *Burns* does not require that result. *See* Detroit Loc. Jt. Exec. Bd., Hotel Employees Union v. Howard Johnson Co., 482 F.2d 489, 494 (6th Cir., 1973). Moreover, since 1964 *Wiley* has undoubtedly had a significant impact on the labor relations policies of both union and management officials in cases presenting successorship problems.[21] To abandon its principles now on the basis of broad dictum in a

19. *See* note 14, *supra*.

20. After an exhaustive analysis of the doctrine of successorship, both in board cases and § 301 cases, one commentator concludes as follows: "By reading *Wiley* and *Burns* together and giving vitality to each, the conclusion seems inescapable that the substantive terms of the contract survive, whether by decision of the arbitrator or the NLRB, only if the successor in word or deed manifests an intent to be bound thereby." Slicker, *supra*, note 17, at 1102; *accord* Pate, *supra*, note 17, at 693. *Contra*, Note, *supra*, note 17, at 577; The Supreme Court, 1971 Term, *supra*, note 17, at 256.

The best summary we have found of the fundamental and perplexing problem one encounters when comparing *Wiley* and *Burns* is by Dean St. Antoine, *supra*, note 17, at 276–77:

"Even though *Burns* and *Wiley* are reconcilable in theory, their approaches are plainly divergent. Both Justice White and Justice Rehnquist in *Burns* speak in terms that would sound familiar in the mouth of a traditional Willistonian—for example, the need for 'consent' under 'normal contract principles,' and the question of whether certain rights and duties were 'in fact' 'assigned' or 'assumed.' This is a far cry from the attitude in *Wiley*. There the Court stressed that 'a collective bargaining agreement is not an ordinary contract,' but a ' "generalized code" ' setting forth ' "the common law of a particular industry or of a particular plant." ' A predecessor's labor contract, according to *Wiley*, could bind the successor employer where there is 'substantial continuity of identity in the business enterprise,' without regard to the existence of actual consent. *Wiley* thus boldly relied on the force of the federal labor statutes to impose contractual obligations on an unconsenting successor; in contrast, *Burns* refocused attention on common law notions of individual assent.

"On a still deeper level, *Burns* reflects a clash between certain fundamental values in the labor field. On the one hand, there is a concern about protecting employees against a sudden and unforeseen loss of bargaining and contract rights. There is also a concern about maintaining industrial stability and labor peace, through reducing the number of representation elections and sustaining the life of labor agreements. On the other hand, stress is laid on the freedom and voluntariness of the collective bargaining process, on the importance of saddling neither unions nor employers with substantive contract terms to which they have not agreed. Stress is further laid on providing maximum flexibility in business arrangements, so that employers may respond to changing market conditions without being straitjacketed by the bargaining or contractual obligations that may have been assumed by imprudent predecessors. *The future development of successorship law undoubtedly depends far more on the way the members of the Supreme Court ultimately balance out these competing values than on any logical deductions from Wiley and Burns.*" (Emphasis added.)

21. Writing in 1968 Professor Goldberg, *supra*, note 17, at 764 n. 45, stated: "My correspondence with counsel in the nine cases, including *Wiley*, in which a federal court has ordered a successor to arbitrate claims based on a predecessor's contract, showed that only two of those cases have in fact led to

case arising in a totally different procedural context and involving successorship via competitive bidding rather than a more typical situation,[22] would be moving too hastily in this complex area of the law. *See generally* Golden State Bottling Co. v. NLRB, n. 18, *supra*.

Although Gypsum did not become a successor by virtue of a merger and expressly refused to assume the collective bargaining agreement, its relationship with the previous employer was substantial. As our earlier discussion of the substantial continuity of identity existing at the plant indicates, this case does not present "a mere naked shifting of a group of employees from one employer to another," *Burns, supra*, 406 U.S. at 304 (Rehnquist, dissenting). It is rather an example of an almost uninterrupted continuation of the same labor environment as existed with the previous employer and owner of the business enterprise. We hold that in the circumstances of this case the arbitrator was not prohibited by national labor policy

arbitration. In each of the others, bargaining between the union and the successor, with the prospect of arbitration if the bargaining should prove unsuccessful, has led to a negotiated settlement of the union's claims." And in 1973 another commentator added: "Experience indicates that once the new employer is ordered to arbitrate a particular grievance, no further resort to official decision-makers is necessary. Interestingly enough, of all the cases mentioned under this heading where the successor's duty to arbitrate was challenged, only *Wiley* and *U. S. Gypsum* have resulted in an arbitrator's award. Only two conclusions are possible: Either the employer completely capitulates after being ordered to arbitrate (which seems unlikely in view of the time, effort and expense involved in procuring the court's decision), or the parties resolve the controversy through the bargaining process rather than through arbitration. In any event, the silence of future reports memorializing the continuation of industrial strife through tests of strength in official forms seems to be the strongest evidence available to support *Wiley's* rationale. On the other hand, this silence may simply mirror a lack of trust in the arbitrable process, the parties preferring their own resolution of the dispute through bargaining to the uncertain award of the outside arbitrator." Slicker, *supra*, note 17 at 1085–86.

from holding Gypsum to the dues check off and wage reopener provisions of its predecessor's labor agreement.

We do not read *Burns* as suggesting that the arbitral process is no longer to play a "central role . . . in effectuating national labor policy." *Wiley, supra*, 376 U.S. at 549. To remove or restrict to the point of meaninglessness the power of an arbitrator to perform his task in the manner *Wiley* envisioned —that is, to bring his informed judgment to bear in determining which, if any, contract terms should survive— would be, we believe, an unwarranted application of *Burns*. *See* Detroit Loc Jt. Exec. Bd., Hotel Employees Union v. Howard Johnson Co., *supra*.[23] Applying *Burns* to prevent an arbitrator from exercising his function with the latitude vital to the arbitral process would ignore the significant differences between an arbitrator and the board. *See Warrior & Gulf Navigation, supra*, 363 U.S. at 578–582; *Enterprise Wheel & Car, su-*

22. "[T]he first, and perhaps the most critical, point to be made about *Burns* is that it hardly represents a typical successorship situation, if indeed it can fairly be called a successorship case at all." St. Antoine, *supra*, note 17, at 270. *See generally* Slicker, *supra* note 17, at 1053–1063.

23. In this case the Sixth Circuit affirmed a lower court decision ordering a new employer to arbitrate with the union even though the employer did not hire a majority of its predecessor's employees because there was otherwise a substantial continuity of identity in the business enterprise. 482 F.2d at 483. The court did not believe that *Burns* was "intended to eviscerate *Wiley*," nor to undermine *Wiley's* emphasis on protecting employees from sudden changes in the employment relationship. *Id.* at 494–495. The court appeared strongly influenced by the differences in the arbitrable process and board proceedings, noting that the flexibility of arbitration could avoid the problems inherent in the *Burns* all or nothing approach. Finally, citing United Steelworkers of America v. Reliance Universal, Inc., *supra*, the court reasoned that whether certain substantive provisions were binding on the successor was a question for the arbitrator in the first instance.

*pra,* 363 U.S. at 597–598.[24] Not being bound by administrative rules and regulations, as well as not being responsible for formulating policy, an arbitrator has a degree of flexibility which the board does not possess. *See Wiley, supra,* 376 U.S. at 551–552 n. 5. *See also* Gulf States Telephone Co. v. Local 1692, Brotherhood of Electrical Workers, 416 F.2d 198 (5th Cir., 1969). For example, after interpreting the contract's provisions dealing with seniority in light of the common law of this shop, the arbitrator here concluded that these provisions of the union-United contract should not govern this aspect of Gypsum's relationship with its employees. *See* n. 9, *supra.* In contrast to this situation, *Burns* indicates that the board would have followed an all or nothing approach, thus introducing an undesirably rigid analysis to the resolution of successorship problems. This flexibility plus an arbitrator's acknowledged expertise in contract interpretation permit him to evaluate the collective bargaining agreement sought to be carried over in light of the conditions existing after the change and against the backdrop of the predecessor's relationship with the union in order to determine the extent to which the predecessor's labor agreement should be deemed binding on the successor. *See* United Steelworkers of America v. Reliance Univeral, Inc., *supra,* 335 F.2d at 895;[25] *Detroit Loc. Jt. Exec. Bd., Hotel Employees Union, supra,* n. 23. Changes in the labor environment may be revealed in this process which would make it inappropriate to carry over any substantive provisions. Or, by examining the particular collective bargaining agreement it might appear that it was designed too specifically to provide the foundation for a workable "system of industrial self-government," *Warrior & Gulf, supra,* 363 U.S. at 580, for the new labor relationship. Whatever may be the ultimate effect of *Burns,* further elaboration is unnecessary to illustrate that there are adequate reasons for not reading that decision as indicative of a national labor policy that precludes an arbitrator from binding a successor to substantive provisions of a prior existing collective bargaining agreement.[26]

24. Collyer Insulated Wire, 192 NLRB No. 150 (1971); *see generally* Wachs, *supra,* note 17, at 228; Note, *supra,* note 17, at 577, 579, 582–83; The Supreme Court, 1971 Term, *supra,* note 17, at 256–57.

25. The *Reliance* court discussed what has since come to be the accepted approach for an arbitrator in a successorship case:

". . . [W]e find implicit in the guarded language of the Wiley opinion, recognition and concern that new circumstances created by the acquisition of a business by a new owner may make it unreasonable or inequitable to require labor or management to adhere to particular terms of a collective bargaining agreement previously negotiated by a different party in different circumstances. Although the pre-existing labor contract indicates the structure of labor relations and the established practice of the shop at the beginning of the new proprietorship, an arbitrator of a subsequent complaint charging unwarranted departure from that scheme may properly consider any relevant new circumstances arising out of the change of ownership, as well as the provisions of and practices under the old contract, in achieving a just and equitable settlement of the grievance at hand. The requirements of the contract remain basic guides to the law of the shop, but the arbitrator may find that equities inherent in changed circumstances require an award in a particular controversy at variance with some term or terms of that contract. We do not imply that any departure from what was established under the old contract is justified by any special circumstances of this case. We do not know. And, in any event, this is a matter for the arbitrator's determination.

"While this is not spelled out in the Wiley case, the power heretofore recognized in arbitrators to achieve justice in situations not contemplated by or not adequately covered in an existing collective bargaining agreement leads us to believe that analogous power exists here. Cf. United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. And see Cox Reflections on Labor Arbitration, 1959, 72 Harv.L.Rev. 1482, 1493–1498."

26. Gypsum did not argue on appeal that there were any contractual provisions which would operate to prevent the arbitrator from holding that some or all of the substantive terms of the contract carried over.

## III.

Although the district court agreed with the arbitrator that the reopener clause was binding on Gypsum and that Gypsum had breached the agreement by failing to negotiate pursuant to it, the court held that the remedy chosen by the arbitrator was unenforceable. The arbitrator had ordered Gypsum to pay the union, for disbursement to the proper employees, the amount of a wage increase which he thought the parties would have agreed to had they negotiated. The union argues that this remedy was well within the arbitrator's authority and urges that we reverse the district court in this respect.

Article XVI of the collective bargaining agreement provides in pertinent part: "In connection with the third year of this contract, it has been agreed that the contract may be reopened only for the negotiation of a wage increase and paid holidays as a fringe issue." [27] In line with its refusal to recognize the union, Gypsum did not negotiate with the union concerning an increase in wages for the third year of the agreement. Since this provision was held binding on Gypsum, its refusal to negotiate constituted a breach of the contract. In most circumstances if this refusal to negotiate were before an arbitrator, he would undoubtedly, assuming he found a breach, order the recalcitrant party to undertake that which it agreed to do—bargain.

But this case is, to say the least, atypical. By the time the arbitrator made his decision, the union had been decertified for approximately five years. The arbitrator considered this fact as effectively precluding current negotiations between a now defunct union and the employer about what they would have done in 1966.[28]

Although recognizing the uniqueness of this situation,[29] as well as the fact that in October the company had without negotiating granted a 6¢ per hour wage increase, the arbitrator concluded that the company's breach compelled him to find a remedy. Reasoning that it was untenable to conclude that negotiations would have produced what the company alone decided to do, he rejected 6¢ per hour as the standard. Starting with the median negotiated wage increase nation-

27. The arbitrator gave no relief with respect to the holiday issue, saying, "had all the Agreement-recognized holidays been converted to paid holidays within the contract year, the cost would have been the equivalent of something like a five-cents-per-hour wage increase. Further, as the plant had long gone without any paid holidays, it seems unlikely that a hefty part of the negotiated package would have allocated to the holiday benefit. More likely it is that there would have been concentration on wages and that the contract year would have been treated as a starter toward paid holidays."

28. Ironically, Gypsum asserted at oral argument that it was not too late to negotiate. This was the union's position before the arbitrator, which he rejected as follows:
"The Union is asking for an order directing the parties now to negotiate on the reopener. The Arbitrator rejects this request. Negotiations on a wage reopener assume the existence of a contractual relationship and the right to strike and to lock out. This is a setting which, on the one hand, defies retroactive establishment and which, on the other hand, cannot now be created by fiat of the Arbitrator. The Union's request is either unreal (if taken as a request to negotiate in the absence of a contractual relationship) or amounts to a request that the decertification be set aside (which the Arbitrator, for the reasons given, is unwilling to do)."

29. The following statement is illustrative:
"What, then, is to be done about the reopener? The Arbitrator admits to great difficulty in coping with the problem. It would be patently wrong to accept as proper and final that which the Company did unilaterally. To do that would be to assume that the negotiating process would have yielded precisely the same as the Company's own calculations yielded. On the other hand, to do anything else brings to the fore the questions of 'how much, in what form and on what basis?' and involves a judgment, obviously hazardous, as to what the parties should reasonably be taken to have done had they negotiated. *Any* sort of corrective determination will have the defect of lacking complete support in logic and analysis and is subject to second-guessing and attack.
"The Arbitrator has weighed things as best he can and makes the following determinations."

wide, the arbitrator applied other factors, including his own experience and expertise, and arrived at a figure of 10¢ an hour as the proper basis from which to calculate his award.[30]

Relying primarily on H. K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), the district court refused to enforce this award. The Supreme Court was there concerned with the remedial power of the board in a refusal to bargain in good faith—unfair labor practice setting. Apparently in an effort to thwart the collective bargaining process, the company adamantly refused to include a dues check off provision in the collective bargaining agreement then being negotiated. Finding that the company had refused to bargain in good faith, the board ordered the company to grant the union a dues check off clause in the contract. After a thorough review of the legislative history of the Act, and particularly that underlying the enactment of § 8(d), the Court held that the board "is without power to compel a company or a union to agree to any substantive contractual provision of a collective bargaining agreement." Id. at 102. The Court reasoned as follows:

"The Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself. One of these fundamental policies is freedom of contract. While the parties' freedom of contract is not absolute under the Act, allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—

private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract."

Id. at 108.

We do not find either the holding or the rationale of H. K. Porter applicable here. There was no contract in existence in that case. What the board ordered was for the company to sign an agreement containing a provision which the union had been unable to get by negotiating. In effect, the board was prescribing a term for the parties' collective bargaining contract, an agreement intended to be the backbone of the parties' relationship for the future duration of the agreement. But in our case the collective bargaining agreement was already in effect. The arbitrator did not order Gypsum to agree to a specific contractual provision to be included in an agreement governing the future relationship of the parties. To be sure, his award required Gypsum to do something which Gypsum had not agreed to do; but this did not occur as a result of Gypsum's refusal to grant, after negotiating, an increase in wages. H. K. Porter would indeed be relevant if, after the parties had negotiated to impasse, the arbitrartor told Gypsum to sign a contract including a 10¢ per hour increase in wages.[31]

The crucial distinction between this case and H. K. Porter is the point in the collective bargaining process when the dispute arose. Contrary to the command of the existing collective bargaining agreement, Gypsum refused to negotiate at all concerning an increase in

30. The arbitrator reasoned as follows:
"... In 1966, the median, nationwide, collectively-bargained wage increase for all industries—and reference is to the increase in wages alone, not the size of a package which includes improvements in fringe benefits—was 11 cents per hour. By excluding the construction industry from 'all industries', the figure becomes 10.4¢. Also, though it so happens that in 1966 the median increase in the South was the same as for the entire nation, settlements in the South have traditionally been some-
what lower than in the rest of the nation —in the two years surrounding 1966, for example, the differentials were .5¢ (1965) and .7¢ (1967). Allowing for these things, and keeping in mind the assumption that the parties would have done but little in the holiday area, the Arbitrator holds that a 10-cents-per-hour wage increase is to be applied as the proper one."

31. This assumes, of course, that the collective bargaining agreement did not give an arbitrator this power.

wages for the third year of the contract. The union was thus deprived of its contractually due opportunity to sit down at the bargaining table and negotiate. At least the union in *H. K. Porter* reached the bargaining table. This, plus good faith, is all the Act was designed to insure. 397 U.S. at 109. Gypsum, however, did not give the union this chance, resulting in a clear breach of the collective bargaining agreement. In an effort to remedy this breach, the arbitrator believed it appropriate to compensate the union, and thereby the employees it had the responsibility of representing, for this loss. Under the circumstances of this case, the arbitrator decided that if he was to remedy the breach, his approach was the only one available.

 Provided that his choice is not precluded by the arbitration provision under which he was acting, is adequately grounded in the contract, and is not arbitrary or capricious, we must uphold his action. *Enterprise Wheel & Car, supra;* International Bhd. of Pulp Workers, Local 874 v. St. Regis Paper Co., 362 F.2d 711 (5th Cir., 1966). The clause defining the scope of the arbitrator's authority reads as follows:

"The arbitrator shall only have jurisdiction and authority to interpret, apply or determine compliance with the provisions of this agreement. The arbitrator shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this contract."

*See* note 32, *infra.*

Contrary to the district court's conclusion, this clause does not preclude the remedy chosen by the arbitrator.

In accord with this clause, the arbitrator was determining whether Gypsum had complied with the requirements of the agreement. Nothing in the reopener provision or in the arbitration clause purports to exclude from arbitral determination the question whether Gypsum complied with the terms of the reopener. And certainly, Gypsum and the union were engaged in a difference "as to the meaning and application of the provisions" of the agreement.[32] our previous discussion of *H. K. Porter* indicates that we do not consider the arbitrator's remedy as making an agreement for the parties or as adding terms to the contract. In the context present here his action merely represents an attempt to make the union whole for the damage suffered as a result of Gypsum's breach of the collective bargaining agreement.[33]

---

32. The relevant portion of Article IX provides:

"Should differences arise between Company and the Union, or it's members employed by the Company, as to the meaning and application of the provisions of this Agreement, or should any local dispute of any kind arise under the contract, there shall be no suspension of work or slowdown by the employees on account of such differences, nor any lockout by the Company, but an earnest effort shall be made to settle the differences.

\*　　\*　　\*　　\*　　\*

"If the difference or differences are not satisfactorily adjusted at the Step 3 meeting, the matter may be referred to arbitration by the Union by notifying the Company in writing within 10 days thereafter.

"The arbitrator shall only have jurisdiction and authority to interpret, apply or

\*　　\*　　\*　　\*　　\*

determine compliance with the provisions of this agreement. The arbitrator shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this contract. The decision of the arbitrator shall be final and binding upon both parties."

33. Under *Wiley* Gypsum was obligated to arbitrate the extent to which its predecessor's contract governed its relationship with the union-represented employees. Then, even more so than now, it was entirely feasible that an arbitrator would hold some or all of the substantive provisions binding on Gypsum. But Gypsum elected to treat the union as if it did not exist, to fight rather than comply with *Wiley* (*see* note 15, *supra*), and to not even cover itself from the possible ramifications of its course of action. In the end Gypsum won, because the union was decertified. And the arbitrator in no way transgressed this determination. He addressed only those rights of the union that matured under the contract as it existed prior to the decertification. One of these was that the union was entitled to reopen the contract for negotiations over an increase in wages.

Having deprived the union of its right to negotiate over an increase in wages, the company is bound by the arbitrator's determination that it must remedy this wrong. Nothing in the agreement precludes the remedy selected by the arbitrator.

 Gypsum contends, however, that the remedy does not comport with the standard for judging the appropriateness of an arbitrator's decision. In *Enterprise Wheel & Car, supra*, 363 U.S. at 597, the Supreme Court said: "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." This oft repeated maxim has not been transgressed here. Granted that the agreement does not provide that if the company refuses to negotiate pursuant to the reopener an arbitrator may award damages calculated on the wage increase he believes negotiations would have produced. The standard does not require such specificity in a collective bargaining agreement. For, as the Supreme Court also said in *Enterprise Wheel & Car*, "[w]hen an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There is a need for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency." *Id.* at 597.

In Minute Maid Co. v. Citrus Workers, Local 444, 331 F.2d 280, 281 (5th Cir., 1964), an arbitrator, finding that an employee had been wrongfully discharged, ordered that he be reinstated with back pay. The company argued that because the collective bargaining agreement did not provide for a back pay remedy, the award should not be enforced. Noting that the "contract did not exclude from arbitration either the subject matter or the remedy adopted by the arbiter," we rejected this contention and held that the essence of the award was adequately grounded in the contract. *See* International Bhd. of Pulp Workers, Local 874 v. St. Regis Paper Co., *supra*; Lodge No. 12 v. Cameron Iron Works, 292 F.2d 112 (5th Cir., 1961). Another example illustrating the limited role of a court when reviewing an arbitrator's award and indicating the expansive interpretation of the "essence" requirement is Amalgamated Meat Cutters of North America, Local 540 v. Neuhoff Bros. Packers, Inc., 481 F.2d 817, 819 (5th Cir., 1973). Neuhoff discharged certain employees for allegedly stealing meat from one of its packing plants. In the arbitration proceedings which followed the company was required to prove its allegations beyond a reasonable doubt in order to justify the discharges. The company failed to meet this standard, and the arbitrator ordered that the employees be reinstated. This court refused to deny enforcement of this award, reasoning that in the absence of a different standard established by the agreement the arbitrator did not, contrary to the command of the arbitration clause, "add to, modify, detract from or alter [the agreement] in any way." *See* United Steelworkers of America v. Amax Aluminum Mill Products, Inc., 451 F.2d 740 (9th Cir., 1971); Holly Sugar Corp. v. Distillery Workers Int'l Union, 412 F.2d 899 (9th Cir., 1969). *See also* International Ass'n. of Heat Insulators, Local 66 v. Leona Lee Corp., 489 F.2d 1032 (5th Cir., 1974).

The nexus between the breach of the reopener clause and the method selected to remedy that breach is sufficient to support the conclusion that the remedy "draws its essence" from the contract. Gypsum's employees were denied their right to negotiate for increased wages. Relief was given in the form of what

they would have received had they negotiated. This remedy is not arbitrary, capricious nor insufficiently grounded in the contract, and it flows logically and reasonably from the breach of the reopener clause. We therefore REVERSE the district court's refusal to enforce this portion of the arbitrator's award. *Amalgamated Meat Cutters of North America, Local 540 v. Neuhoff Bros. Packers, Inc., supra; Safeway Stores v. American Bakery Workers Union, Local 111,* 390 F.2d 79 (5th Cir., 1968); *Dallas Typographical Union, No. 173 v. A. H. Belo Corp.,* 372 F.2d 577 (5th Cir., 1967); *International Bhd. of Pulp Workers, Local 874 v. St. Regis Paper Co., supra; see International Assoc. of Machinists v. Hayes Corp.,* 296 F.2d 238 (5th Cir., 1961); *Federal Labor Union No. 18887 v. Midvale-Heppenstall Co.,* 421 F.2d 1289 (3rd Cir., 1970); *United Steelworkers of America v. Amax Aluminum Mill Products, Inc., supra. See also NLRB v. Strong,* 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *Brotherhood of Railroad Trainmen v. Central of Georgia Ry. Co.,* 415 F.2d 403 (5th Cir., 1969).

■ Gypsum's final two contentions relate to the arbitrability of the wage reopener dispute. The first is that because the grievances we ordered to arbitration in *Gypsum I* did not specifically mention the wage reopener, it was not an issue before the arbitrator. After reviewing the circumstances of the case, the arbitrator rejected this contention, concluding that "the question of the reopener is properly seen as inhering in Items 1, 5 and 6 of the Grievance Report." As the Supreme Court aptly pointed out in *Wiley,* "[q]uestions concerning the procedural prerequisites to arbitration do not arise in a vacuum; they develop in the context of an actual dispute about the rights of the parties to the contract and those covered by it." 376 U.S. at 556–557. For this reason the Court held that questions of this nature are for arbitral determination. The arbitrator, having resolved Gypsum's contention in favor of arbitrability, cannot be overturned except under the limited standards, previously discussed, by which a court reviews an arbitrator's award. We can discern no reason for refusing to enforce the award on the basis of Gypsum's argument. *See Wiley, supra,* 376 U.S. at 555–559; *International Assoc. of Machinists v. Hayes Corp., supra,* 296 F.2d at 243–244; *Tobacco Workers Union, Local 317 v. Lorillard Corp.,* 448 F.2d 949, 953–954 (4th Cir., 1971), and cases cited therein. *See also NLRB v. Fant Milling Co.,* 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed. 2d 1243 (1959).

■ Finally, Gypsum asserts that because the reopener provision says the contract may be reopened only for negotiations, it excludes this matter from the arbitral process. The cases relied on by Gypsum do not support this broad proposition. In *United Aircraft Corp. v. IAM,* 360 F.2d 150 (5th Cir., 1966), for instance, the arbitration provision expressly excluded from arbitral determination grievances relating to demotions. *Haynes v. United States Pipe & Foundry Co.,* 362 F.2d 414 (5th Cir., 1966), is likewise inapposite because there arbitration was not part of the grievance machinery; contractual remedies ended with the denial of the claim by the plant manager. And in *RCA v. Ass'n of Scientists,* 414 F.2d 893 (3rd Cir., 1969), the collective bargaining agreement did not even contain a clause covering the dispute which the union asserted was subject to arbitration. Here, however, differences between the union and the company concerning the application of or compliance with the collective bargaining agreement were subject to arbitration. *See* note 32, *supra.* This was just such a dispute. There is simply no provision purporting to exclude this dispute from the arbitral process. It certainly cannot "be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," *Warrior & Gulf Navigation, supra,* 363 U.S. at 582, in order to refuse enforcement on the basis that the dispute was not arbitrable. Gypsum's problem is that it analyzes the reopener issues as if it had com-

plied with the contract, negotiated to impasse, and the arbitrator had then come on the scene giving the union something it failed to get in the negotiations. If this is what had happened, its arguments would indeed have some force.

### IV.

We turn now to the arbitrator's dues check off award and related problems. Article VI of the collective bargaining agreement provides in pertinent part:

"The Company agrees to deduct Union dues in the sum of $5.00 per month from the pay of employee who gives written authorization to the Company for such deduction, and to transmit dues collected to the International Secretary-Treasurer, Pittsburgh, Pennsylvania, on or before the fifteenth of the month in which such dues are collected as long as such authorization is validly in effect and is not revoked by the employee. Deductions will be made on the first pay period in each month. All revocations must be in writing addressed to the Company with a copy forwarded to the recording secretary of the local union."

Gypsum's failure to check off dues after its purchase of the plant was one of the five enumerated grievances which we ordered to arbitration in *Gypsum I*. The arbitrator held this provision binding, held that Gypsum had breached its obligation thereunder, and ordered it to pay, without reimbursement from its employees, the union the amount which should have been deducted between the date of the take-over and the date of the union's decertification.

In the district court on the union's suit to enforce the award, the arbitrator was upheld regarding the binding effect, as well as the breach, of the dues check off provision. But believing that the portion of the award preventing Gypsum from recouping its payment from its employees would have the effect of re-

quiring Gypsum to violate § 302(a) of the Act (*see* note 12, *supra*), the court modified the award and permitted Gypsum to withhold the necessary amounts from its employees' future wages. The court then gave the union the option of taking attorney's fees and costs instead of lost dues, and the union accepted this alternative.

■■ Considering first Gypsum's attack on the arbitrator's decision that the check off term was binding and that it was breached, we agree with the district court that this aspect of the award is enforceable. Our earlier discussion disposes of the contention that the arbitrator does not have the power to hold this substantive provision of the contract binding on Gypsum. And we reject Gypsum's veiled attempt to have us pass on the merits of the award in the guise of determining whether it is adequately grounded in a contract so as to be entitled to enforcement. Reiterating, the dispute over Gypsum's obligation to check off dues was a difference between the company and the union as to the meaning and application of one of the agreement's provisions and thus plainly subject to arbitration. *See* note 32, *supra*. By the agreement the arbitrator had "jurisdiction and authority to interpret, apply or determine compliance, with the agreement's provisions." This is exactly what he did in deciding that Gypsum had failed to comply. His decision is not arbitrary or capricious, and his rejection of Gypsum's defenses does not, as the company now argues, amount to a denial of due process. "On its face the award . . . [reveals] that it finds its source in the contract and those circumstances out of which comes the 'common law of the shop.'" Safeway Stores v. American Bakery Workers Union, Local 111, *supra*, 390 F.2d at 82. We may not therefore "assay the legal correctness of the reasoning pursued," *id.*; Dallas Typographical Union, No. 173 v. A. H. Belo Corp., *supra*, 372 F.2d at 579, and decline to enforce the award.[34]

---

34. *See generally* E. Jones, The Name of the Game is Decision—Some Reflections on "Ar-
bitrability" and "Authority" in Labor Arbitration, 46 Tex.L.Rev. 865 (1968).

Section 302(a) of the Act makes it unlawful for an employer to pay money to a labor organization. The district court held that the arbitrator's award requring Gypsum to reimburse the union for dues it failed to check off without corresponding deductions from its employees' wages compelled Gypsum to violate this statute. Although an adequate basis for refusing to enforce an arbitrator's award is that it would require a violation of the Act, we do not believe that is the effect of the award in this instance.

Section 302(c)(2) provides:

"The provisions of this section shall not be applicable . . . with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress."

Since the purpose of § 302(a) is to protect employers from extortion and to insure honest, uninfluenced representation of employees,[35] and in view of the exclusion from its coverage of an arbitrator's award we hold that § 302(a) does not render the arbitrator's award here unenforceable. *See also* Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); Hinson v. NLRB, 428 F.2d 133 (8th Cir., 1970). Nor can we say that the arbitrator's decision requiring the company to pay the award without recoupment from its employees is not within his remedial authority.

Finally, some comment is necessary concerning the standard for awarding attorney's fees in a § 301 case. Lo-

cal 149, UAW v. American Brake Shoe Co., 298 F.2d 212 (4th Cir., 1962), is the seminal case in this area and has been cited with apparent approval in two pertinent cases from our circuit. In Dallas Typographical Union, No. 173 v. A. H. Belo Corp., *supra*, 372 F.2d at 583, we said: "Without determining when or under what circumstances attorney's fees might be permissible, [citing *American Brake*] we think the Trial Court was eminently justified in declining them here." Then in International U. of Dist. 50, UMW v. Bowman Transportation, Inc., 421 F.2d 934, 935 (5th Cir., 1970), again citing *American Brake,* the court set up the standard as follows: The district court has authority to award attorney's fees where it determines that a party has without justification refused to abide by the award of an arbitrator." The court held that the district court had not abused its discretion in awarding costs and attorney's fees "under all the facts and circumstances of this particular case." Although neither our opinion nor the district court's opinion discusses the factual basis for the award of attorney's fees, it is implicit that the facts must have supported the conclusion that the company had "without justification refused to abide by the award of [the] arbitrator."[36] It does not appear that this is the standard used by the district court in awarding attorney's fees in this case. For this reason and because of our disposition of the wage reopener and dues check off issues, it is appropriate that we remand the case for further proceedings in the district court.

The judgment of the district court is affirmed in part, reversed in part and the cause is remanded for further proceedings consistent with this opinion.

---

35. *See* United States v. Arnunziato, 293 F.2d 373 (2nd Cir., 1961) cert. den. 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134; Grajcyzk v. Douglas Aircraft Co., 210 F.Supp. 702 (S.D. Calif., 1962).

36. The Eighth Circuit recently cited *Bowman* for the proposition that attorney's fees are compensatory in nature; the court upheld such an award on the basis of the district court's conclusion that the company's defenses to a union's § 301 suit exhibited "bad faith" on the part of the company. United Steelworkers of America v. Butler Mfg. Co., 439 F.2d 1110 (8th Cir., 1971).