**DALLAS TYPOGRAPHICAL UNION, NO. 173, Appellant,**

v.

**A. H. BELO CORPORATION, Appellee.**

**A. H. BELO CORPORATION, Appellant,**

v.

**DALLAS TYPOGRAPHICAL UNION, NO. 173, Appellee.**

No. 23319.

United States Court of Appeals
Fifth Circuit.
Feb. 13, 1967.

L. N. D. Wells, Jr., Mullinax, Wells, Mauzy, Levy & Richards, Dallas, Tex., for appellant.

Larry M. Lesh, of Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for appellee.

Before BROWN, COLEMAN, and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Proving again that the infusion of judicial enthusiasm for arbitration in labor relations does not always keep the Judiciary out of the act, both parties sought the aid of the Court and neither is happy with the outcome. The Employer[1] displeased with the arbitration awards ordering reinstatement with back pay of two employees sought injunctive relief against enforcement. The Union[2] pleased with the awards cross-claimed for enforcement. On motions for summary judgment, the District Court, performing a Solomonic role, The Oil Screw Noah's Arc v. Bently & Felton Corp., 5 Cir., 1961, 292 F.2d 437, 1961 AMC 1641, declined to deny enforcement as such, denied enforcement of the back pay award, dismissed the Employer's complaint, but declared that if the two discharged employees extended an appropriate written apology to the Employer, he would order reinstatement as to the future. The Union, now unhappy, appeals seeking full enforcement plus, for good measure, attorney's fees. The Employer, likewise unhappy, but perhaps not quite so much so, urges us to reverse this action of the District Court and deny enforcement including reinstatement. On the merits, we conclude the Union is right and we reverse with directions.

This case also proves the prescience of the Supreme Court in its trilogy opinions[3] when it spoke of the "common law of the shop," 363 U.S. at 580, 80 S.Ct. 1347, reminiscent of earlier expressions in the railway field[4] that even the language of the disputants makes little sense, is a strange and sometimes weird jargon to the uninitiated, including sophisticated uninitiates, which Judges presumably are supposed to be. Thus it is, at least from the Union's viewpoint, that the controversy grows out of action by the two dischargees, Royer and Watkins, the Chapel Chairman and Assistant Chapel Chairman acting not in the role of spiritual religious advisers to their fellows, but as union spokesmen in the routine handling of employer-union problems arising in the shop.[5] What the controversy was all about was whether retired employee Laurent should be included in a printed listing of "priority" as an "extra" employee for assignment to a "regular" "situation" for the week following Saturday, May 8, 1965.[6] Mr.

---

1. A. H. Belo Corporation, publisher of the long-established Dallas Morning News.

2. Dallas Typographical Union No. 173, the bargaining agent for the printers employed in the composing room.

3. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424; United Steelworkers v. Warrior & Gulf Nav. Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409, 1419.

4. The Industry "has its own customs and its own vocabulary, and lives according to rules of its own making." Elgin, Joliet & Eastern Ry. Co. v. Burley, 1944, 325 U.S. 711, 751, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886, 1909 (dissent).

5. The Employer insists that the collective bargaining agreement makes no reference to these ecclesiastically named advocates. But it is perfectly plain to us that the assistant shop foreman and later the shop foreman recognized that each had a right to speak on behalf of the Union point of view in the dispute which smoldered into the controversy. Moreover, the LMRA assured to employees the right of collective bargaining through representatives of their own choosing, § 7, 29 U.S.C.A. § 157, and there is no doubt that both the foreman and assistant foreman were aware that Royer and Watkins were advocating the Union's views as to the employee Laurent.

6. A "situation" is something different from what non-typographical mortals think. It is in effect an opening for regular work assignment. On the Union's theory, Laurent as an "extra" employee had a priority date of December 7, 1964, and on the basis of "priority" was entitled to a "regular" situation. Cf. collective bargaining contract, § 14, p. 17. § 14(b) requires "that the competent extra oldest in continuous service is entitled to a regular situation."

Laurent, a retired individual on a pension, returned seeking employment. The Employer considered that he was not entitled to priority. When the Employer on May 8, 1965, added four "situations" to the work schedule for the coming week, the Union insisted, the Employer denied, that Laurent should be listed for one of the additional situations. The work schedule, as one might suppose for a typographical plant, was prepared from type set on a linotype machine. In the harangue that involved assistant foreman Newnam, later foreman Abbott, Assistant Chapel Chairman Watkins who called on a higher power, Chapel Chairman Royer, the immediate controversy was whether Laurent's name was to be set in the schedule. Royer said it was to be and Watkins carried out that instruction. When foreman Abbott three times instructed Watkins to remove Laurent's name, tempers and ire arose, Royer and Abbott apparently argued forceably and to keep Watkins from carrying out the fourth instruction Royer took the type representing the work schedule and "pied" the form into the "hell box."[7]

The upshot was the foreman Abbott discharged Watkins for failure to comply with his instructions, and on Royer's protest, he too was discharged. The written notice of discharge required by the collective bargaining agreement charged Royer with "interfering with the operations of the office, pieing a company form * * *" which "are * * * violations of the office rules," and as to Watkins, "for refusing to comply with the direct order of the foreman, which constitutes insubordination * * *."

This set the stage for arbitration under a grievance procedure which was both sweeping and specific. It committed to the Joint Standing Committee and in the event of disagreement to the Arbitration Board with a fifth member as an impartial umpire "all questions that may arise regarding this contract or scale of wages, discharge cases, the interpretation to be placed on any clause or clauses of this agreement or scale, or any alleged violation thereof, which cannot be settled otherwise."[8] It prescribed that the "decision of this board * * * shall be final and binding upon both parties, * * *" and "shall be limited to a determination of the specific question or questions referred to it for adjudication."[9] It dealt specifically with discharge cases investing the arbitration machinery with the power to "sustain the discharge, or reinstate the employee with or without pay, depending on the circumstances involved."[10] Furthermore, except in discharge cases, the contract provided for maintenance of the status quo pending resolution of the dispute.[11]

The arbiter[12] in holding the discharges unjustified rejected the Employer's claim of a violation of office rules[13] on two

7. In typographicalese "pieing" is apparently dumping a form; the "hell box", again with no ecclesiastical implications, is a waste receptacle for type or lead.

8. Contract, § 4 at p. 9.

9. Contract, § 4 at p. 10.

10. Contract. § 4(b).

11. "If any controversy arises as to the interpretation of this agreement, *except in discharge cases*, the conditions prevailing prior to the dispute shall be maintained until the controversy is disposed of as provided herein." [Emphasis added.] Contract, § 4(c).

12. The Employer for reasons not disclosed and certainly not evident except the unlikely one that "half a loaf would be bet-

ter than none," Societa Anonima Navigazione Alta Italia v. Oil Transport Co., 5 Cir., 1956, 232 F.2d 422, 423, 1956 AMC 1073, insisted on separate arbitrations for the two interrelated discharges. Arbitrator Giles made the lead decision in Royer's case. Arbitrator Johannes conforming to the parties, stipulation permitting free interchange of records relied extensively, if not altogether, on the Royer decision as the basis for his award in Watkins.

13. "Office Rule No. 6: Disorderly conduct (whether on or off duty) in this building or on the premises in any form, such as * * * loud * * * language * * * arguments or otherwise interfering with the production or the business of the newspaper, or the taking

grounds which are, however, so intertwined as to be one. The first is that, as required by the contract incorporating nonconflicting rules [14] of the International Union as inviolate,[15] enforcement of the office rules would be unfair. Secord, the unfairness comes primarily from the fact that at the moment of the dispute which was climaxed by the summary discharges, Royer and Watkins were not acting as employees doing company work *vis-a-vis* the Employer. Rather, they were on an "equal footing" as advocates of the Union, the Union's position and Laurent.

■ Although we have difficulty in divining just what it is the Employer means in its four-pronged attack [16] on the awards, our task is simplified by its candor stated below and reiterated here that " * * * the question is not whether there are facts to support this award, that is not the question before this Court. We do not seek to challenge any fact findings * * *." At the same time we must take guard that with this beguiling candor, we do not succumb to the temptation to decide the merits of this controversy not because of a difference with fact findings, but because we differ with what sound legal principles would compel from such fact findings. For we must recognize—indeed, discipline ourselves to make certain that we are conscious of it always—that if the

controversy is one for grievance machinery and for resolution by an arbitrator whose decision is expressly to be final and binding, there is every likelihood that that chosen umpire may well make errors both of fact and law—that is errors in the eyes of Judges now having a narrowly circumscribed function.

■ Thus it is here. Without a doubt the discharge is the proper subject for arbitration and the relief accorded was within the express power of the arbiters (see notes 8 and 10). Cf. Refinery Employees Union, etc. v. Continental Oil Company, 5 Cir., 1959, 268 F.2d 447, 454. And there was at least an arguable basis for the use of the contractual sources upon which the arbitrator drew. The foreman and assistant foreman were obviously conscious that a serious difference existed between management and Royer and Watkins in the interpretation and application of the contractual provisions and shop practice regarding Laurent's "priority" and right to the added "situations." And there is more than adequate basis for the conclusion that to the knowledge of management's spokesman, Royer and Watkins were acting as Union advocates. And with violation of office rules being asserted as the Employer's justification for the discharges, this properly brought into play the express provisions of the contract as well as the International Union Rules incor-

up of the time of another employee, is not permitted."

"Office Rule No. 8: * * * The defacing of the property of the employer by * * * damaging * * * machinery or other equipment, or defacing any office sign, or notice, or changing the wording in any way, is not permitted."

"Office Rule No. 9: Care and duty must be exercised in carrying out the assignments and instructions from those in authority. Insubordination, of any kind, is not permitted."

14. "It is understood and agreed that the General Laws of the International Typographical Union in effect January 1, 1964, not in conflict with state and federal law or this contract, shall govern relations between the parties on conditions not specifically enumerated herein." Contract, § 3(a).

15. "It is understood and agreed that * * * the laws of the International Typographical Union in effect on January 1, 1964, shall not be subject to arbitration." Contract, § 4.

16. (1) The arbitrators failed to confine their awards to interpretation and application of the contract, but undertook to dispense their own brand of industrial justice.

(2) The awards were based upon a matter which the contract excluded from arbitration.

(3) The arbiters exceeded the scope of submission of the disputes.

(4) Arbitrator Johannes based his award on the Giles' award, a matter not before him.

porated as standards.[17] The right accorded under the contract to challenge the "fairness" of a company rule [18] was certainly broad enough to cover not only an intrinsic inescapable invalidity of a given rule, but an "unfair" application in a given situation of an otherwise acceptably fair rule. It was these materials in the light of the shop management-labor relations that led the arbiters to conclude that the refusal to carry out the demands of the foreman was neither insubordination nor a refusal to obey an order in the Employer's work. Rather, so the arbiters concluded, it was a case of an unwillingness on the part of Union representatives acting as such to acquiesce in management's interpretation of contract provisions which, in the conscientious judgment of the Union advocates, was contrary to the interests of the Union, its members, and in derogation of their contract rights.

■ Nor is this altered, as Employer contends, because the contract § 4(a) "Makes it imperative * * * on both parties whenever any differences of opinion as to the rights of the parties under the contract shall arise, or whenever any dispute as to the interpretation of the contract or any of its provisions takes place" to "at once * * * appeal" to the Grievance Committee. The fact that the disputants undertook to try to persuade each other and in those efforts tempers may have flared does not forfeit arbitration rights under § 4. Indeed, that contract provides for the Joint Committee and fifth umpire arbitration for controversies "which cannot be settled otherwise" and this, the arbiters could conclude, was what the Union advocates were trying to do.

■ In this setting unless we are to abandon faithful adherence to the strong admonitions of the trilogy opinions (note 3, supra) [19] and the many of our own in their train, it is not for us to say, as the Employer urges, that pieing the form into the hell box [20] was destruction of company property in violation of Office Rule No. 8 (note 13, supra), or the refusal or the manner in which the argument was carried on amounted either to insubordination or failure to carry out orders under Rule 6, 9, or both (note 13, supra). Although it is true that all have been warned that an "arbitrator is confined to interpretation and application of the collective bargaining agreement * * *" and "does not sit to dispense his own brand of industrial justice," 363 U.S. 593 at 597, 80 S.Ct. 1358 at 1361, 4 L.Ed.2d 1424, and " * * * if the award is

17. § 13(b): "The foreman shall be the judge of an employee's competency. He may discharge * * * (3) for violation of office rules which shall be kept conspicuously posted, and which shall in no way abridge the civil rights of employees, or their rights under International Typographical Union laws as accepted in Subsection (a), Section 3, of this contract."

18. Article II, § 3, International Typographical Union Laws:
"* * * A discharged journeyman shall have the right to challenge the fairness of any office rule which is applied to bring about his discharge."

19. The congressional policy is manifest: "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. * * *." LMRA § 203(d), 29 U.S.C.A. § 173(d). The Court points out that this "policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." 363 U.S. at 566, 80 S.Ct. at 1346, 4 L.Ed.2d at 1406. See also Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 452–454, 77 S.Ct. 912, 915–917, 1 L.Ed.2d 972, 978–797.

20. There is considerable doubt whether this so-called "form" is the Employer's or the Union's. Obviously the lead belongs to the Employer, but the lead was not destroyed. There is much to indicate that both the preparation and the content of the "priority" list or form was for the Union alone. See, e. g., Article VI, § 2, I.T.U. General Laws which provides that the Union "shall establish a system for registering and recording priority. * * * The priority standing of a journeyman shall stand as recorded."

arbitrary, capricious or not adequately grounded in the basic collective bargaining contract, it will not be enforced by the courts," International Association of Machinists, AFL–CIO v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238, 243; see also Marble Products Co. of Ga. v. Local 155, United Stone, etc., Workers, 5 Cir., 1964, 335 F.2d 468, 471; H. K. Porter Co. v. United Saw, etc., Workers, 3 Cir., 1964, 333 F.2d 596, 600, this record does not either call for or permit such action.

■ Great stress is put on the Second Circuit's decision in Torrington Co. v. Metal Products Workers Union Local 1645, 2 Cir., 1966, 362 F.2d 677. That decision seems to us to carry its own caveat. Couched as it is in terms of whether the bargaining agreement "*authorizes* the arbitrator to expand its express terms on the basis of the parties' prior practice" (emphasis added), 362 F.2d at 680, we think it has to be very carefully confined lest, under the guise of the arbitrator not having "authority" to arrive at his ill-founded conclusions of law or fact, or both, the reviewing-enforcing court takes over the arbitrator's function.

■ The Employer's second contention (see note 16, supra) scarcely deserves mention. Considering the pre-eminent importance of the International Typographical Union Laws, accorded repeatedly in the collective bargaining agreement (see notes 14 and 17, supra), it simply makes no sense to urge that their sacrosanct nature placing them beyond arbitration (see note 15, supra) excludes these Union laws from application by either Court or arbitrator in the resolution of a grievance. The arbitrators were fully authorized to draw on them.

■ The same is true of the third contention (see note 16, supra). Arbitrator Giles characterized the contention of the dischargee and the Union to be "that the [Employer's] reasons for this discharge action were not supported by the facts." The Employer contends that the arbitrator's conclusion of an un-justified discharge because the office rules were unfair in their asserted application amounted to the arbitrator exceeding his powers under the agreement which prescribed that the arbiter "shall be limited to a determination of the specific question or questions referred to it for adjudication." The question submitted was whether the discharges were justifiable. That is what the arbitrator determined and as to this attack, it really matters not whether his reasons were sound or unsound. He certainly did not exceed the contractual scope of submission.

■ Even less need be said as to the fourth contention (note 16, supra). The parties authorized each arbiter to consider the record in the other case. There being no showing whatsoever that one was influenced by facts in one case not present in the other, it was certainly permissible in the developing field of arbitral common law that one arbiter would draw freely on principles akin to stare decisis, res judicata, and collateral estoppel on matters as closely intertwined as these.

■ This leaves only the Union's contention that it should have been entitled to attorney's fees. Without determining when or under what circumstances attorney's fees might be permissible, cf. Local No. 149 International Union, etc. v. American Brake Shoe Co., 4 Cir., 1962, 298 F.2d 212, 216, we think the Trial Court was eminently justified in declining them here.

The upshot of it is that we conclude the Union is otherwise completely correct and the Employer's position is unsound. The Employer was not entitled to an injunction against enforcement. On the contrary, the awards should have been enforced. The Trial Court's decree must accordingly be modified to direct on remand that the awards be enforced to achieve reinstatement and back pay.

Reversed and modified in part and remanded.