**GULF STATES TELEPHONE COMPANY, Appellant,**

v.

**LOCAL 1692, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, et al., Appellees.**

No. 25929.

United States Court of Appeals
Fifth Circuit.

Aug. 12, 1969.

---

8. Transcript, page 927.

George E. Seay, Durwood D. Crawford, Dallas, Tex., for appellant; Malone, Seay, Gwinn & Crawford, Dallas, Tex., of counsel.

L. N. D. Wells, Jr., Mullinax, Wells, Mauzy, Levy & Richards, Dallas, Tex., for appellees.

Before JOHN R. BROWN, Chief Judge, AINSWORTH, Circuit Judge, and FULTON, District Judge.

JOHN R. BROWN, Chief Judge:

On cross motions for summary judgment the District Court upheld the Union and ordered enforcement of the Arbiter's decision granting reinstatement to the Grievant with back pay to commence about nine months after discharge and to run until reinstatement. The Employer appeals asserting that enforcement of the award would violate public policy of Texas and, even there, lead to a breach of the peace and most certainly a loss of that tranquility which should characterize the atmosphere of a good place to work.

What brings this about was not so much a violation of the common law of the shop—out of which the Arbiter's need and power jointly proceed—as it was the frailty of human nature and its affectionate nurture of just ordinary gossip. Indigenous to contemporary interest in things erotic, the specific subject of this gossip concerned the activities of two employees, one, naturally, a woman—a switchboard operator—the other a man—an outside installer-repairer. The complication was that the woman's husband was also an employee.

According to the Employer, it discharged the Grievant because he started and spread rumors that the woman employee and the other employee had been engaged in an affair for some time. But after hearing oral testimony covering 360 pages, the Arbiter, a Law professor at Southern Methodist School of Law, saw the picture quite differently. As he saw things it all began on Friday, July 2. The Grievant and two other employees were in the test board room when a question came up about why it had taken the "other man" so long to get to a nearby small town for a work assignment. To this concern someone (not the Grievant) replied "I can tell you why it took so long * * * He stopped at [the woman employee's] house." Not content with that, he went on to say that at some recent time he had seen this man park his truck in a neighbor-

ing carport and then walk to the woman employee's house. As we read the Arbiter's decision it was at this point that Grievant made his first contribution—a matter of fact statement that he too had seen a furtive-like parking of that same employee's truck and a walk to the woman employee's house. There was, to be sure, some conflicting testimony which tended to magnify the Grievant's participation and an interest in getting Employer to discipline or discharge, not the woman employee, but the "other man" who had quite a reputation as a local philanderer. Later that afternoon the Grievant and the woman employee encountered each other and discussed what was said among the three male employees earlier. During the following week the story apparently became a matter of central interest in this small Texas city. When the word got back to the husband—actually through his father—he precipitated a conference in a nearby city with Employer's personnel supervisor. He was accompanied, oddly enough, by the male employee accused of the misdeeds. In the investigation by Employer it is clear that Grievant did not make the full disclosure later given and credited. And the Arbiter emphasized in his findings that later in the day on Friday, July 2, and again on the following Monday, July 5, Grievant, in what were otherwise quite unprovocative, casual encounters with the woman employee, repeated to her the statement earlier made concerning her suspected conduct. The upshot was that Grievant was discharged for starting and circulating these rumors.

But when the Arbiter got through with this inquiry about who said what about whom at what time, it turned out to be much like any back fence gossip— the story got better as it went along but in the beginning—and in fact—there was nothing to it. More important, as a problem in industrial—not domestic—relations the alleged instigator (Grievant) was found not to have started it, but rather his own "sin" was in giving it a little currency when another brought it up initially and then in pressing the matter in wholly private, undisclosed conversations with the woman employee.

The Arbiter found that the "whole unpleasantness" was not started by Grievant but that another employee "started up the whole subject." Finding that Grievant spoke only to the two fellow employees in the initial discussion (and twice later privately with the woman employee), the Arbiter concluded emphatically that "There is no evidence that [Grievant] spoke of his suspicions to others in the exchange or in the [local] community."

Moreover, Grievant had urged on the woman employee that "the matter * * * should be dropped." Grievant's undoing was his mistaken belief that he should try to protect the employee who first broached the subject and who was becoming the object of criticism by the woman, her husband, and the alleged paramour. The Arbiter then wrapped it all up in words which would do credit to the best of judges—elected, appointed, with limited or life tenure:

"On the whole case the Arbitrator does not think that [Grievant] should have been discharged. When he filed his grievance, he made known [the other employee's] primary role in starting the whole unpleasantness. The Arbitrator is persuaded by the testimony that [Grievant] trapped himself when he tried to protect [that employee]. While [Grievant] created unpleasantness for [the woman employee], there is no evidence that he spread rumors beyond the small circle of people involved in the several discussions on July 2 and 5. [Grievant] spoke unwisely and foolishly, but the Arbitrator does not believe that just and lawful cause existed for his outright discharge. [Grievant] conducted himself with quietness and dignity at the hearing. His previous record and seniority count for something in arguing against the extreme penalty in industrial relations."

The Employer, having earlier lost on the issue of arbitrability,[1] as an almost automatic instinctive reflex to the adverse award on the merits, asserted the Gemini attack of lack of the Arbiter's "authority" to decide as he did.[2]

More often than not—and certainly that is so here—this is a poor mask for a desire to have the court redetermine the facts—even just a tiny bit—or reach a legal conclusion on them as found or hoped for which differs from that of the consensually annointed judge.

This is nothing new to us. In *Belo*[3] we phrased it this way. We "must recognize—indeed, discipline ourselves to make certain that we are conscious of it always—that if the controversy is one for grievance machinery and for resolution by an arbitrator whose decision is expressly to be final and binding, there is every likelihood that that chosen umpire may well make errors both of fact and law—that is errors in the eyes of Judges now having a narrowly circum-

scribed function." And nothing before or since[4] affords any real basis for apprehending that the Fifth Circuit has succumbed to this beguiling plea.[5]

With this approval all washes out. Recognizing that in some situations enforcement of a mandated arbitral award will be denied because it compels violation of law or conduct contrary to accepted public policy,[6] we see no ground for denial on either basis on the findings as made. Nor is anything of significant substance added by the dubious effort to expand the "record" by post-award affidavits proferred as a part of Employer's motion for summary judgment reflecting the convictions of the woman employee, her husband, the suspect and the manager that if Grievant is reinstated his presence would create personal tensions leading to a breach of the peace. Although hard for Employer to accept, the Arbiter has found against the accusation which led to discharge, that Grievant started and thereafter cir-

1. In the initial suit by the Union to compel arbitration, the parties stipulated that this should be determined as a first stage by the Arbiter.

2. See E. Jones, Jr., The Name of the Game is Decision—Some Reflections on "Arbitrability" and "Authority" in Labor Arbitration, 46 Texas L.Rev. 865 (July, 1968).

   "In the process of settling labor disputes, the name of the game has always been Decision. The movable pieces most recently in vogue in its playing are the ideas clustering about the concepts of 'arbitrability' and 'authority.'" 46 Texas L. Rev. at 865.

   The notion of authority is expanded under the broad heading of "Power" in a similar recent and extensive critical analysis. B. Dunau, Three Problems in Labor Arbitration, 55 Va.L.Rev. 427, 439–462 (1969).

3. Dallas Typographical Union No. 173 v. A. H. Belo Corp., 5 Cir., 1967, 372 F.2d 577, 581.

4. "The merits of the grievance * * * are all matters for the arbiter and not for the Court." Deaton Truck Line, Inc. v. Local 612, 5 Cir., 1962, 314 F.2d 418, 422. The "judicial inquiry under § 301 must be strictly confined to the question

whether the reluctant party did agree to * * * give the arbitrator power to make the award he made." Palestine Telephone Co. v. Local Union 1506, 5 Cir., 1967, 379 F.2d 234, 236. "It is not the function of the courts to weigh the merits of the decision of the arbitral body on an arbitrable issue which the parties agreed be final." Teamsters Local Unions v. Braswell Motor Freight Lines, 5 Cir., 1968, 392 F.2d 1, 9. See also Columbian Carbon Co. v. International Union of Operating Engineers Local Union No. 405, 5 Cir., 1966, 360 F.2d 1018, 1020; Safeway Stores v. American Bakery & Confectionery Workers Intern. Union, Local 111, 5 Cir., 1968, 390 F.2d 79.

5. To the guarded, perhaps more restrained, criticism levelled by this Court at the Second Circuit's now celebrated Torrington Co. v. Metal Products Workers Union Local 1645, 2 Cir., 1966, 362 F.2d 677 (See *Belo, supra*, 372 F.2d 577, 583) contemporary writers voice theirs in no uncertain terms. See *Jones, supra*, note 2, at 869–877, and *Dunau, supra*, note 2, at 454–462.

6. See *Dunau, supra*, note 2, at 439–411 on violation of law and 441–447 concerning public policy.

culated false rumors about the woman employee.[7]

■ That the Arbiter did find that Grievant ought not, along with his fellow workers, to have fallen prey to the lamentable frailty of giving a little credence to a rumor just loosened and ought not later to have added irritation by privately repeating the charges to the woman employee is a long, long way from upholding Employer's charges. In short, the Arbiter held that the facts did not warrant the discharge, and consequently it was not for a "just and lawful cause." Of course, under the board provisions for arbitration,[8] it was within the competence of the Arbiter[9] to determine that while discharge was not merited, some discipline less awesome was in order.[10] This he meted out by substantially postponing the commencement of back pay, thus making the Grievant bear a considerable loss himself.

Rejecting these attacks and the cases urged by Employer, we end this as we have others. "The arbiter was chosen to be the Judge. That Judge has spoken. There it ends."[11]

Affirmed.

7. In what may be a legislative policy contradiction, Texas affords men a preferred protection by a written law, Vernon's Ann. Texas Penal Code, Art. 1220. For less provocative situations women are protected at least against slander from malicious, false, wanton imputation of a "want of chastity." Texas Penal Code, Art. 1293.

8. The collective bargaining agreement provides an elaborate grievance procedure, Article I, § 6, and, in the event "any grievance * * * is not amicably adjusted and settled in the manner provided, the same shall be submitted, at the written request of the Union, to a Board of Arbitration * * *." The contract is explicit that the Arbitrator's decision "shall be final and binding on all parties involved in such controversy or grievance and shall conclusively determine the same." Art. I, § 3.

9. No basis for the attack is found in § 4 which prescribed "Section 4. The arbitrators shall be confined to the grievance

involved for decision, and may in no event, as a part of such decision, imposed upon either party any obligation to arbitrate on any subjects which have not herein been agreed upon as subjects for arbitration, nor may they, as a part of any such decision, affect reformation of this Agreement, or any of the provisions thereof, nor require the arbitrator in order to rule in favor of the grievance to exceed the scope of his jurisdiction hereunder."

10. Arbitral determination not only of the existence of misconduct but of the fitness of the punishment is routinely grist for the arbitral mill." *Dunau, supra,* note 2, at 451 and n. 62.
See also Lynchburg Foundry Co. v. United Steel Workers of America, Local 2556, 4 Cir., 1968, 404 F.2d 259.

11. Safeway Stores v. American Bakery & Confectionery Workers Inter. Union Local 111, 5 Cir., 1968, 390 F.2d 79, 84. See also *Dunau, supra,* note 2, at 462. It takes judicial self-discipline of an exacting order. See *Jones, supra,* at 879.