**AMOCO OIL COMPANY,
Plaintiff-Appellant,**

v.

**OIL, CHEMICAL AND ATOMIC WORK-
ERS INTERNATIONAL UNION,
LOCAL 7-1, INC. and Paul A. Seman,
Defendants-Appellees.**

**No. 76–1507.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1976,

Decided Jan. 24, 1977.

Certiorari Denied May 2, 1977.
See 97 S.Ct. 1697.

George J. Zazas, Indianapolis, Ind., Maurice R. Glover, Chicago, Ill., for plaintiff-appellant.

Arnold E. Charnin, Gilbert A. Cornfield, Chicago, Ill., for defendants-appellees.

Before HASTINGS, Senior Circuit Judge, MOORE, Senior Circuit Judge,* and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

This case involves the narrow questions of whether the arbitrator exceeded the authority accorded him under the collective bargaining agreement and whether the award rendered reinstating the grievant with full seniority rights but without back pay is so arbitrary and capricious as to warrant denial of enforcement by this court. We resolve both questions in favor of appellees and order enforcement of the award in all respects.

I

The peculiar circumstances which give rise to this case must be set forth in detail. Appellee Seman, the grievant in this matter, has been employed by appellant Amoco Oil Company (hereinafter referred to as the "Company") for more than three decades. The record indicates that Seman maintained throughout his life an extraordinarily active interest in civic affairs, often inciting controversy through his vocal opposition to governmental decisions and actions which he deemed not in the public interest. In the words of the arbitrator, Seman remained "active in civic affairs, pollution, and school affairs, had been active in suits against the Company and the City Administration, had taken pictures of Company facilities (indicating violation of anti-pollution laws and ordinances), disrupted City meetings, delayed City projects, was an outspoken critic of City Administration, and was getting in everyone's hair and causing problems." App. at 8. He had instituted litigation against the City and against the Company, had been arrested at the order of the Mayor and won a dismissal of charges, and "in general had driven the City Administration of Whiting to the point of distraction." Id.

On September 11, 1973 at 11:00 p. m., while Seman was at home with his wife, son and two guests, members of the Whiting Fire Department arrived at his residence in response to a "fire in progress" call. A

---

* Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

small fire in Seman's basement was extinguished. Although the Chief of the Whiting Fire Department is customarily summoned only to witness a conflagration of some magnitude, the Chief was called for assistance in this instance by the fire captain on the scene. The Chief arrived soon thereafter, accompanied by a photographer and a Captain of Detectives. The fireman observed equipment with Amoco markings branded thereon in the basement.

On the following day, September 12, 1973, at approximately 10:00 a. m., fire and police investigators returned to the scene of the fire to photograph the basement, which contained many items of equipment clearly designated as the property of Amoco. The Company was notified of the discovery of its equipment in Seman's basement, and the house was placed under surveillance by the Whiting Police Department in order to prevent unobserved removal of the Amoco material prior to the initiation of further action.

On September 13, 1973, at approximately 6:00 p. m., police, accompanied by Company officials, served a search warrant upon Seman and began the task of removing the Company equipment and loading it onto flat bed trucks. Between four to six hours was required to complete this chore. Approximately $30,000 worth of equipment was removed, including 43 chain lifts, seven chipping guns, 11 ladders, and three jackhammers; the items removed occupied space in a warehouse which measured approximately 30' x 15', and were stacked several feet high. Spectators to this removal process included virtually every member of the Whiting City Government, such as the City Judge, the City Attorney, the City Engineer, six of the seven Councilmen, and the Mayor. The carnival atmosphere surrounding this spectacle was enhanced when wives and secretaries of the aforementioned city officials set up a table and proceeded to dispense coffee and doughnuts to the audience. Seman was absolved of any criminal taint as a result of the discovery of $30,000 worth of Amoco equipment in his home.[1] A private fire investigator hired by an insurance company determined after investigation that the fire was ignited in two distinct locations in the basement with petrochemical incendiary devices, and involved a clear case of arson.[2]

On September 14, 1973, the Company discharged Seman. A grievance filed on his behalf was processed to arbitration before an impartial arbitrator selected by the parties, pursuant to the collective bargaining agreement between the Company and Oil, Chemical and Atomic Workers International Union, Local 7–1, Inc. (hereinafter referred to as the "Union"). The agreement delineated the rights retained by the Company as follows:

It is not the purpose of this Agreement in any way to infringe or impair the normal Management rights of the Company except as otherwise expressly provided. Included among the Management rights unaffected are the right to hire and the right to discipline or discharge employees for just cause.[3]

In accordance with its past policy, the Company is posting herewith a list of the offenses for which an employee may be suspended or discharged with further notice. This is done in order that all employees may be informed fully as to the offenses for which suspensions or discharges may be made. There is also appended a statement concerning the issuing of written notices for offenses other than those shown in the list.

*Offenses for Which an Employee May be Suspended or Discharged Without Further Notice*
1. Violation of any law. Special attention is called to the following:
   (a) Carrying concealed weapons; fighting or attempting bodily injury to another; drunkenness; conduct which violates the

---

1. Criminal charges were dismissed after the search warrant issued on September 13, 1973 was quashed and the evidence gleaned thereunder suppressed.

2. The fire investigator testified at the subsequent arbitration proceeding that he had examined more than 1200 fire scenes, and was unequivocally convinced that arson was the cause of the fire in Seman's basement. Interestingly, however, Whiting city investigators remained unable to determine the cause of the blaze.

3. Pertinent provisions of Company policy regarding cause for discharge are stated as follows:

App. at 2. The authority conferred upon the arbitrator during the arbitration of grievances is expressed in the following language:

> Discharge and suspension grievances shall be introduced directly to the third stage of bargaining and shall become eligible for arbitration as promptly as possible. . . . If the Management action of discharging such employee is reversed, and the employee is reinstated with no disciplinary action taken in lieu thereof, then the employee will be paid in full by the Company for all wages lost as a result of the discharge.

App. at 12.

The arbitrator articulated the salient question as follows:

> Was the Grievant, Paul Seaman [sic] discharged for just cause? If not, what is the remedy?

The defendants assumed the position throughout the course of the arbitration hearing that no just cause for Seman's discharge existed, because his possession of Company property resulted not from wrongful conduct on his part which might justify termination of his employment, but

> common decency or morality of the community.
> (b) Stealing, or malicious mischief resulting in the injury or destruction of property of other employees or of the Company.
> (c) Cruelty to animals which are the property of other employees or the Company.
>
> *    *    *    *    *    *
>
> 7. The possession or exercise by any employee of any habits, demeanor, characteristics, action or course of action that makes him objectionable to other employees or the management or that makes his retention in the service disruptive of a spirit of harmony therein or would cause other employees to leave the service.
>
> *    *    *    *    *    *
>
> *Notices in Writing for Other Offenses*
> For offenses other than those listed above, an employee shall not be suspended or discharged without first having been notified in writing that a repetition of the offense will make him liable to suspension or discharge.
> App. at 12–13.

4. The Union argued that, given the unequivocal conclusion that the fire resulted from arson, rather was a stratagem of a group of unknown conspirators who sought to incite his discharge. To buttress this contention, defendants stressed Seman's role as the self-appointed community conservator of citizens' interests, a role which earned him the opprobrium of city officials. Further, defendants maintained that the bizarre sequence of circumstances surrounding the discovery of the Company equipment[4] pointed inexorably to the conclusion that a group of unidentified conspirators had schemed to finally "get the Grievant out of the hair of the City." App. at 11.

The Company countered these assertions by reiterating that Amoco property had been unauthorizedly possessed by Seman, and urging that the Union's mere allegations of conspiracy did not constitute proof that this material had been secreted in Seman's home without his consent or knowledge.

After reviewing the factual background and the contentions of the parties, the arbitrator initiated his discussion of the case with the observation that:

> To begin with, the Company on September 14, 1973, had just cause to dis-

Seman would not have ignited the blaze while his wife, son and two guests occupied the house, and would not have wittingly summoned the fire department had he been aware of the presence of the Amoco equipment. The arrival of the Fire Chief, a Captain of Detectives and a photographer was cited as further indication of conspiracy, for the presence of these individuals was admittedly disproportionate to the magnitude of the small domestic fire involved. The inference to be drawn, posited defendants, was that these persons "were aware that Amoco equipment would be found at the scene of the fire," App. at 11, and desired to thoroughly document the occasion. The carnival atmosphere pervading the execution of the search warrant, with virtually the entire city government participating as gleeful spectators munching doughnuts, is pointed to as indicative of the possibility that a conspiracy to instigate Seman's termination by the Company existed.

It must be noted, however, that the Union does not contend that the Company participated in or was cognizant of a conspiracy directed toward Seman.

charge the Grievant. He admittedly had in his possession Company equipment valued at over $30,000, which equipment he had no right to have. The question with which we must grapple is whether the Company still had just cause at the conclusion of the arbitration hearing. As will be shown, it is the finding that the Company did not ultimately have just cause to discharge the Grievant.

App. at 13–14.

In a well-reasoned opinion, the arbitrator catalogued those points he deemed supportive of Seman's allegation that the Amoco material found in his basement was deliberately secreted there by persons unknown, and that this placement reflected a conspiracy by these persons to provoke his discharge. Conceding that Seman was "not an ordinary man" either in the civic and moral values he espoused or in the elements of his individual life style, the arbitrator commented that:

> He evidenced an extraordinary contempt for the *indicia* of success common to most: he did not drive nor own a car, dressed in a most odd manner, and patently held the opinion that most people had of him in complete contempt. His life style was also different; few of us keep our refrigerators in our dining rooms, and have to eat standing up because there is no room to sit down. From the photographs admitted in the Hearing, he had an extraordinary tolerance for disorder in his home, to the point where he was unable to promptly differentiate between his kitchen and his dining room when photographs of one was shown to him, in fact, initially misidentifying the room. The condition of his basement

storage can be generously described as chaotic.

App. at 14.

Seman's unusual social concern, manifested as a propensity toward litigiousness, was viewed as a basis for "motive on the part of numberless groups" to conspire in the hopes of gaining some measure of revenge against him. Further, the arbitrator could discern neither a mode of transporting the thousands of pounds of material to his home,[5] nor a motive for Seman, given his demonstrated lack of acquisitiveness, to steal heavy equipment of questionable utility which was readily identifiable as the property of the Company.[6]

The arbitrator also focused upon the highly peculiar conduct of the city officials in determining that Seman's allegations of conspiracy were not groundless. The unusual and rapid assembly of fire and police officials at the scene of a small fire, the failure of city inspectors to determine the cause of the fire, despite the unequivocal conclusion of a private investigator that arson was involved, the exaggerated carnival activity participated in by virtually every city government official impelled the arbitrator to remark:

> The fact that there was glee at the fact that the "gadfly" had hopefully had his stinger pulled, was not surprising, but the extent and expressions of that glee have to lend a touch of credence to the charges of the Grievant. Would a Government which reacted so cheerfully at the downfall of an opponent also do anything to create that downfall?

App. at 15.

The arbitrator recognized, however, that the unusual circumstances of this case held

---

**5.** Seman neither owned a car nor had a driver's license and commuted to his job via bicycle. App. at 16.

**6.** Seman's cognizance of his vulnerability to charges of moral inadequacy by those he constantly challenged is demonstrated in his testimony that:

> [H]e was aware that he had to be "purer than Caesar's wife" because he was daily flying in the face of the power structure, and was susceptible to being discredited if he fell below the highest plane of moral conduct. App. at 16.

troubling questions even if conspiracy were a proven fact. In his words:

[I]f someone were to "set up" the Grievant, why would that person or organization go to such extremes? The possession of even a few items of Company property would certainly be grounds for discharge. Why then fill a basement with tons of material? And how was this done, if it were done by someone without the knowledge of the Grievant?

App. at 16–17.

The conclusion of the arbitrator's opinion reveals his resolution of the questions arising from this perplexing maze of occurrences, particularly the critical question of how the Company found its way into Seman's home.

The Grievant alleges conspiracy, but has not proved it. Most frankly, however, he has raised enough doubts so that I believe the level of proof of his complicity in the possession of the Company property does not reach that required to sustain his discharge.

Thus, I find that as of October 6, 1975, the Company does not have just cause for discharging the Grievant, although they had just cause from the knowledge in their possession on September 14, 1973.

What is the Company liability for their actions of September 14? The Grievant has admitted, and I agree with him, that he has no proof whatsoever of any Company involvement in any conspiracy. If an outside group conspired to "set up" the Grievant so that he would be discharged, then the Grievant's remedy for his damages must be against that group, not against the Company, who acted with just cause when they acted.

App. at 17.

In allowing the grievance, the arbitrator ordered that Seman be promptly reinstated to employment with no forfeiture of seniority, but without back pay.

The district court vacated this award, termed "arbitrary" and "capricious" in an unpublished order dated January 30, 1976. However, on February 26, 1976, the district court granted defendants' motion to reconsider, set aside its previous order, and requested further briefing and oral argument on the matter.[7] On April 13, 1976, the district court determined that judicial interference in this award was improper, and ordered its enforcement, stating:

A district court must suppress any tendency to replace its evaluation of the facts for that of the chosen arbitrator. In this case that temptation is great. Very reluctantly, this Court has determined that these well established rules require it to refrain from upsetting this award.

App. at 44.

Plaintiff appeals from this decision.

## II

Plaintiff-appellant challenges the award in this court on two bases: first, that the arbitrator exceeded his contractual authority in allowing the grievance, and second, that the award is "arbitrary" and "capricious" because not grounded in reason or fact, and therefore does not merit enforcement.

■ We begin by reiterating that national policy, as articulated in the Steelworkers trilogy,[8] favoring the orderly resolution of grievances through arbitration where the parties have agreed contractually to be bound by the arbitrator's determination, severely circumscribes the role of a reviewing court. The scope of judicial inquiry, precluded from entertaining a review of the merits of an arbitral award, is confined to the narrow questions of whether

---

7. The court stated that language in two recent opinions by this court, *United Electrical Radio & Machine Workers of America v. Honeywell, Inc.*, 522 F.2d 1221 (7th Cir. 1975) and *International Union of Operating Engineers, Local 139 v. Morse, Inc.*, 529 F.2d 574 (7th Cir. 1976), underlay the decision to reconsider the earlier ruling issued in the instant case.

8. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

the award "draws its essence from the collective bargaining agreement" and whether "the arbitrator's words manifest an infidelity to this obligation." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). An arbitrator's award does "draw its essence from the collective bargaining agreement" so long as the interpretation can in some rational manner be derived from the agreement, "viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award." *Ludwig Honold Manufacturing Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969). *See also International Union of District 50, United Mine Workers of America v. Bowman Transportation, Inc.*, 421 F.2d 934, 935 (5th Cir. 1970); *Torrington Company v. Metal Products Workers Union, Local 1645*, 362 F.2d 677, 682 (2d Cir. 1966) (Feinberg, J., dissenting). Neither the correctness of the arbitrator's conclusion nor the propriety of his reasoning is relevant to a reviewing court, so long as his award complies with the aforementioned standards to be applied by the reviewing court in exercising its limited function. *Ludwig Honold, supra*, at 1132.

With these general principles in mind, we address the Company's specific arguments.

### A

Plaintiff-appellant's contention that the arbitrator exceeded the authority accorded him in the collective bargaining agreement stems from its characterization of the arbitrator's resolution as two distinct determinations regarding the existence of just cause. The Company contends that under the contract the arbitrator derives authority solely to review the Company's decision to discharge, and in this case the arbitrator did so, determining that just cause supporting the Company's action existed on September 14, 1973. The alleged arbitral misfeasance occurred in the arbitrator's unwar-

ranted independent pronouncement that just cause no longer existed at the time the arbitral ruling was rendered, some 25 months later. While a superficial and literal reading of the arbitrator's opinion might yield that interpretation, such a literal characterization serves to elevate style over substance. In finding that "the Company did not *ultimately* have just cause to discharge the Grievant," App. at 14 (emphasis added), the arbitrator declared:

> Thus, I find that as of October 6, 1975, the Company does not have just cause for discharging the Grievant, although they had just cause *from the knowledge in their possession* on September 14, 1973.

App. at 17 (emphasis added).

■ Thus, the thrust of this opinion is that although the Company acted in compliance with the knowledge in its possession and without unseemly motive in dismissing Seman, such discharge occurred without just cause since the arbitrator remained unpersuaded that Seman was implicated in any wrong-doing which warranted his termination, according to the contract. The Company's good faith cannot substitute for the just cause requirement. *Rheem Automotive Company*, 27 Lab.Arb. 863, 866 (1956). The salient issue, whether just cause supported the Company's decision, albeit made in good faith, was resolved adversely to the Company. This judgment is within the sphere of arbitral authority contemplated by the parties' contract, which accords the arbitrator the authority to review Company determinations regarding just cause, and therefore must be enforced by this court.

■ We reiterate, in so holding, two admonitions which well serve to guide reviewing courts in the resolution of similar claims regarding the wielding of excessive authority by an arbitrator. First, the Supreme Court has declared that the fact that an arbitrator's opinion is susceptible of varying interpretations is of no moment in the determination of the validity of the accompanying award.

A mere ambiguity in the opinion accompanying an award, which permits the

inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement.

*Enterprise Wheel, supra*, at 363 U.S. 598, 80 S.Ct. at 1361.

■ Second, the Fifth Circuit has cautioned against use of the "authority" argument as a ruse to induce the reviewing court to "redetermine the facts—even just a tiny bit—or reach a legal conclusion on them as found or hoped for which differs from that of the consensually annointed [sic] judge." *Gulf States Telephone Company v. Local 1692, International Brotherhood of Electrical Workers, AFL–CIO*, 416 F.2d 198, 201 (5th Cir. 1969). *See also Dallas Typographical Union 173 v. A. H. Belo Corp.*, 372 F.2d 577, 583 (5th Cir. 1967).

Here, the arbitrator was empowered to review the propriety of a discharge under a "just cause" standard. His view of the circumstances surrounding the termination led him to conclude that just cause did not exist. His award, therefore, "draws its essence from the collective bargaining agreement" and does not "manifest an infidelity to this agreement." *Enterprise Wheel, supra*, 363 U.S., at 597, 80 S.Ct. at 1361. Our inquiry goes no further.

**B**

■ The Company's contention that the award is unenforceable because arbitrary, capricious, and without foundation in reason or fact is premised upon the assertion that the existence of a conspiracy was not conclusively proven, and is not a "fact" which can form a rationally inferable basis for the award. The Company decision to terminate Seman was grounded solely in acceptance of the negative inferences arising from his unauthorized possession of Amoco property. However, the inferences drawn from circumstantial evidence may be rebutted or explained, and the weight to be accorded both the inferences and the contradictory explanations is a matter solely within the arbitral sphere.

■ Here, the arbitrator noted the undisputed fact that Amoco equipment was found in Seman's basement. The inference of theft by Seman arising from this unauthorized possession was countered by a number of pertinent observations, although the arbitrator could not conclusively find the existence of a conspiracy to "set up" Seman. The arbitrator emphasized the long and heretofore successful employment of Seman; his demonstrably high moral standards, integrity, lack of acquisitiveness, and civic concern; the state of chaos prevailing in this home, which lends credence to the notion that tons of heavy equipment might remain undetected by the dwellers of the premises; his lack of access to a motor vehicle with which to transport the material to his home; and the bizarre conduct of city officials in summoning important persons to witness a relatively insignificant fire, in failing to detect an apparently obvious case of arson in the igniting of that fire, and in exaggerated manifestations of unabashed glee during the execution of the search warrant. An aggregation of the foregoing considerations impelled the arbitrator to conclude that "the level of proof of [Seman's] complicity in the possession of the Company property does not reach that required to sustain his discharge." App. at 17. We cannot hold his judgment, based upon articulated considerations, arbitrary or capricious.

Moreover, the determination that Seman was entitled to reinstatement without forfeiture of his seniority, but with denial of back pay evidences neither arbitrariness nor inconsistency. The contract requires payment of back pay to an employee discharged without just cause only if reinstatement is ordered with no disciplinary action taken in lieu of discharge, leaving the arbitrator free to mete out discipline where deemed appropriate. *Cf. Enterprise*

*Wheel, supra,* at 597, 80 S.Ct. 1358. Since the Company action in discharging Seman on September 14, 1973, upon its discovery of Amoco property unauthorizedly in his possession, was determined to be a good faith response, the denial of back pay is analogous to a suspension pending satisfactory explanation of the possession of Company property. We will not substitute our judgment for that of the consensually appointed arbitrator regarding the propriety of this disciplinary measure. *Enterprise Wheel, supra; International Union of District 50, United Mine Workers of America v. Bowman Transportation, Inc.,* 421 F.2d 934 (5th Cir. 1970); *International Association of Machinists District No. 8, AFL–CIO v. Campbell Soup Co.,* 406 F.2d 1223 (7th Cir.), *cert. denied,* 396 U.S. 820, 90 S.Ct. 57, 24 L.Ed.2d 70 (1969); *Gulf States, supra; Yellow Cab Company v. Democratic Union Organizing Committee, Local 777, S. I. U. N. A., AFL–CIO,* 398 F.2d 735 (7th Cir. 1968), *cert. denied,* 393 U.S. 1015, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969).

### III

■ Defendants-appellees claim an entitlement to attorneys' fees and costs of suit, contending that the Company's challenge of the award is totally without justification. We cannot hold that the Company's position is so wholly devoid of merit as to warrant the imposition of costs and fees, particularly in view of the fact that the district court initially upheld the validity of the Company's contentions. *Local 149 International Union, United Automobile, Aircraft & Agricultural Implement Workers of America v. American Brake Shoe Co.,* 298 F.2d 212 (4th Cir.), *cert. denied,* 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962).

Accordingly, attorneys' fees and costs of suit are denied. The award of the arbitrator is, in all respects,

ENFORCED.

MOORE, Circuit Judge (dissenting):

I dissent from the majority's enforcement of this arbitration award because the arbitrator's decision is inconsistent and irrational and exceeds the contractual authority accorded the arbitrator by the collective bargaining agreement.

The arbitrator derives his authority solely from the collective bargaining agreement between the Amoco Oil Company, Whiting Refinery ("Company"), and the Oil, Chemical and Atomic Workers International Union, Local 7–1, Inc. ("Union"), so any action taken by him in derogation of the agreement must be null and void. The agreement expressly provides in the Preamble that it does not intend "in any way to infringe or impair" Management's "right to . . . *discharge employees for just cause.*" (Emphasis added).

The grievance procedures established in Article II of the bargaining agreement, including arbitration, complement Management's prerogative by unambiguously providing for only a limited review of the Company's decision to discharge: if the Company had "just cause" for the discharge, its action must be upheld. The grievance procedures do not empower an arbitrator to second-guess Management as to what course of action should fairly be taken almost two years after the events of which a grievant complains. As the Supreme Court stated in *United Steelworkers v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), in setting forth the standard for judicial review of industrial arbitration awards:

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of the problem. . . . *Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.* He may of course look for guidance from many sources, yet *his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. 363

U.S. at 597, 80 S.Ct. at 1361 (emphasis added).

This court endorsed these guidelines most recently in *Cannon v. Consolidated Freightways Corp.*, 524 F.2d 290, 295 (7th Cir. 1975), where it explained that

> [o]f course, a court may review and set aside an award if . . . the arbitrator exceeds his contractual authority.

*See also International Ass'n. of Machinists, Dist. No. 8 v. Campbell Soup Company*, 406 F.2d 1223, 1225 (7th Cir.), *cert. denied*, 396 U.S. 820, 90 S.Ct. 57, 24 L.Ed.2d 70 (1969); *Torrington Co. v. Metal Products Workers Union Local 1645*, 362 F.2d 677, 680 (2d Cir. 1966).

Pursuant to the Company-Union bargaining agreement, this arbitrator was empowered only to make a finding on the single issue of whether or not the Company had acted with "just cause" in discharging Seman on September 14, 1973. The agreement vested no authority in the arbitrator to make his own determination as to whether *he* would have discharged Seman in 1973 or at any other time. Nor did the agreement authorize the arbitrator to weigh the "facts" available in October, 1975 to decide what *he* felt the company should do in the way of fair treatment of its former employee. Yet these unauthorized determinations, which in no way draw their "essence" from the collective bargaining agreement, are precisely those from which the arbitrator derived his award.

The arbitrator expressly found in the first sentence of his analysis, and repeated in similar words later in his opinion, that in fact "the Company on September 14, 1973, had just cause to discharge the Grievant [Seman]." This conclusion was amply supported by the arbitrator's findings of fact. Company policy had long made theft of company property a ground for discharge. Seman, admittedly without authorization, had over $30,000 worth of the Company's heavy industrial equipment in the basement of his home on September 11, 1973, and he offered no plausible explanation as to how it came to be there. His only response was to allege, without any factual support, that

some unidentified persons must have conspired to "plant" the equipment in his basement. Troubling issues, such as how this could be accomplished without his knowledge, and why his adversaries would stockpile several tons of contraband when a mere jackhammer would have sufficed, he left unanswered. As the arbitrator found, the damaging inference of the unauthorized possession of company property provided ample "just cause" for the discharge, establishing that the Company acted entirely within its contractual right.

The substantive accuracy of this conclusion of the arbitrator is not the focus of our inquiry. Rather, the conclusion is significant because it demonstrates that with his express finding that the Company had acted properly in 1973, he fully expended his mandate under the collective bargaining agreement. With that finding he had completed the performance of his duties, and his investigation should then have terminated. Yet, he went beyond reviewing the authority for the Company's decision, reasoning that *as of October 6, 1975*, "just cause" for discharge *no longer existed*. But Seman's conduct as of October 6, 1975 was completely irrelevant to the issue of the propriety of his discharge, for it was only the September, 1973 discoveries upon which the discharge in issue was based. This second conclusion is quite obviously a separate finding regarding the existence of "just cause", unrelated to the first finding and wholly dehors the arbitrator's scope of authority. It shows a "manifest disregard" of the bargaining agreement and in itself requires vacatur of the award.

No amount of interpretation by the majority, no mitigating judicial reformulation of the "thrust" of the arbitrator's decision, can conceal or explain away the fact that the award was grounded on this second, unauthorized finding that "as of October 6, 1975, the Company does not have just cause for discharging the Grievant [Seman]. . . . ." To recognize that the award was so grounded does not, as the majority suggest, "elevate style over substance"; it simply admits the literal existence of two dis-

tinct findings relative to "just cause." In making the second determination, the arbitrator placed himself in the role of management and ignored the fact that his authority was limited to interpreting and applying the collective bargaining agreement. In other words, he began to "dispense his own brand of industrial justice", something he is prohibited from doing.

As a result of the arbitrator's unauthorized veto of a managerial decision protected by the collective bargaining agreement, the Company was ordered to reinstate Seman even though it had not been found to have breached the bargaining agreement by discharging him. Yet, without a finding of breach the discharge of Seman can only be deemed entirely proper. The decision of the arbitrator is thus inconsistent and irrational, and even extensive rewriting of it by this court cannot make it properly enforceable.

Accordingly, I would vacate the award.